108 A.3d 739

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Herbert BLAKENEY, Appellant.**

Supreme Court of Pennsylvania.

Submitted Dec. 11, 2012.

Decided Dec. 29, 2014.

4

8

Helen A. Marino, Esq., Defender Association of Philadelphia, for Herbert Blakeney.

Joseph P. Cardinale Jr., Esq., Jason Eugene McMurry, Esq., Dauphin County District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, STEVENS, JJ.

## *OPINION*

PER CURIAM.

In this capital case, Herbert Blakeney, a.k.a. Shabazz Muhammad, appeals from the order of the Court of Common Pleas of Dauphin County denying, without a hearing, his petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. For the reasons set forth below, we affirm.

We set forth the facts of this case in our opinion on direct appeal, which affirmed Appellant's sentence of death. *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645 (2008). The following is a summary of the facts pertinent to the issues now raised. After a domestic dispute that resulted in Harrisburg

police escorting Appellant from his wife's apartment during the afternoon of February 1, 2000, Appellant returned to the premises in the early morning hours of February 2, having spent much of his time in the interim drinking alcohol with friends. Because he had been repeatedly phoning and leaving confrontational messages during that time, Appellant's wife had left her apartment and another resident of the apartment, Duana Swanson, had alerted the Harrisburg police.

When Appellant returned to the apartment, he assaulted Ms. Swanson, stabbing her in the chest with a knife. The police arrived to find Ms. Swanson in a prone position on the floor with Appellant straddling her, holding the knife. The officers commanded Appellant to drop the weapon, but Appellant replied "shoot me" and waved the knife at them. Appellant then stood up and retreated down a hallway to a bedroom. There, he picked up his wife's fourteen-month-old son (by another man), held the knife to the baby's neck, and again told police to "shoot me." Appellant refused police commands to drop the weapon and release the baby. He retreated further down the hallway to a stairwell, where he slit the baby's throat with the knife, killing him. Harrisburg Police Officer William Vernouski, who had followed Appellant to the stairwell, witnessed the killing. Officer Vernouski shot Appellant, and he was taken into custody. Appellant was charged with murder and attempted murder, among other crimes.

Appellant was initially held at Dauphin County Prison but, after several weeks, he was involuntarily committed to Mayview State Hospital ("MSH") for psychiatric evaluation, treatment, and a determination of competency.[1] Upon Appellant's discharge, his psychiatrist reported that Appellant was competent to stand trial. Appellant's discharge report also contained diagnoses of adjustment disorder with depressed mood

1. Appellant had expressed suicidal thoughts and actions, and had exhibited bizarre, uncooperative, and belligerent behavior while at Dauphin County Prison. On February 22, 2000, the court involuntarily committed Appellant to MSH to determine whether he was incompetent under 50 P.S. § 7402 (Incompetence to Proceed on Criminal Charges and Lack of Criminal Responsibility as Defense). Appellant was discharged from MSH on April 17, 2000.

in remission, alcohol dependency and personality disorder. His condition at the time of discharge was described as alert and cooperative, with no perceived signs of depression, suicidal ideation, thought disorders, or hallucinations.

The court appointed counsel to represent Appellant. Appellant told his attorneys that he wanted to present a defense of innocence and maintained, among other things, that Officer Vernouski had killed the child. Appellant maintained that the Commonwealth's case against him was the result of a police conspiracy and cover-up, and he asked counsel to defend the charges against him accordingly. When counsel advised Appellant that the facts did not support such a defense, Appellant told counsel that he wanted to represent himself. Counsel filed a motion to withdraw, advising the court that Appellant wished to represent himself. On January 29, 2001, during a hearing on the motion, the court conducted a lengthy and thorough colloquy with Appellant. The court then granted the motion, permitted Appellant to proceed *pro se* and appointed Appellant's former attorneys as standby counsel.

Prior to trial, Appellant filed a written *pro se* motion to have the charges against him dismissed on double jeopardy grounds.[2] Appellant asserted that, while he was incarcerated in the Dauphin County Prison before his commitment to MSH, he had undergone a trial by a jury of his peers which resulted in his acquittal. At the hearing on the motion, the prosecutor argued that the motion was frivolous. The court found that the motion was meritless. N.T., 6/27/02, at 25. The court issued a written order that same date, reflecting that the motion had been denied and that the double jeopardy claim had no merit.

On July 22, 2002, ten days before trial was scheduled to begin, Appellant filed a *pro se* petition in the Superior Court seeking permission to appeal the denial of the pre-trial double

2. The motion to dismiss on double jeopardy grounds was one of nine written *pro se* motions filed by Appellant. The court conducted a hearing on the motions on June 27, 2002, and all the motions were denied.

jeopardy motion. As of August 1, 2002, the first day of trial, the Superior Court had not ruled on the petition, and thus jury selection commenced. Appellant inquired of potential jurors whether they could conclude that the police had engaged in a conspiracy or in other misconduct if facts were presented to substantiate those claims. He asked potential jurors if they would be "willing to accept the possibility that a law enforcement officer may get on the stand and lie?" N.T. Jury Selection, at 69. Appellant probed potential jurors for any negative biases they might have had toward Muslims or *pro se* litigants. He exercised peremptory strikes and challenged a number of the potential jurors for cause.

During the jury selection process, Appellant asked the court whether a greater percentage, *i.e.* "at least ... three or four out of every ten," of the pool of potential jurors could be representatives of the "black population." The court answered that "this is all by draw, ... it is a random drawing. It is through the Pennsylvania License Bureau." *Id.* at 138–39. After the Commonwealth had exercised four of its peremptory strikes, Appellant made an oral motion seeking, "in the interest of justice and diversity," to seat the last two jurors peremptorily stricken by the Commonwealth. *Id.* at 367.[3] The court denied the motion. Immediately thereafter, Appellant orally moved for the recusal of the trial judge, the Honorable John F. Cherry. The basis for the motion was that Appellant had instituted a civil lawsuit against Dauphin County Prison and the trial judge was a member of the prison board. The motion for recusal was denied.

On Monday, August 5, 2002, the trial court explained on the record, in Appellant's presence, that it was making inquiries to the Superior Court regarding when a disposition of Appellant's double jeopardy petition might be expected. On August 7, 2002, the trial court issued an additional order stating that Appellant's allegation of a double jeopardy violation was patently frivolous The Superior Court denied Appellant's petition

3. Appellant described the jurors in question as "the female that had experience in domestic abuse ... [a]nd the African–American male." *Id.* at 366.

for permission to appeal by per curiam order dated August 9, 2002.

At trial, Appellant sought to establish by his own testimony and his questioning of forensics experts, police officers on the scene, and officers responsible for maintaining a chain of custody for the evidence removed from the scene, that Officer Vernouski, not Appellant, had inflicted the fatal knife wounds on the infant. To that end, Appellant presented the testimony of his own expert witness in forensics and crime-scene investigation, who described the blood patterns at the scene. The court had previously granted Appellant's *pro se* request for DNA testing, and at trial, the Commonwealth stipulated to the findings contained in the DNA report showing that genetic material from someone other than Appellant and the baby had been recovered in the stairwell in which the incident occurred. In addition, in an apparent effort to potentially establish diminished capacity, Appellant presented the testimony of several persons with whom he had been drinking in the hours before he had returned to the apartment. The jury returned a verdict of guilty on, among other offenses, first-degree murder.

Following the jury's guilty verdict, Appellant informed the court that he would not present any mitigation evidence during the penalty phase. The court explained to Appellant the potentially dire legal consequences of such a decision, and confirmed that Appellant had consulted with standby counsel in reaching the decision to forego the presentation of mitigation evidence. Standby counsel then reiterated a request "for funds on behalf of the Defendant to obtain a psychologist for the penalty phase," a request that had previously been denied. N.T. Trial, 8/8/02, at 925.[4] Standby counsel identified the

4. Prior to trial, Appellant had filed a *pro se* motion styled as a "Petition for Psychiatrist Analyzation [sic] of/for Irresistible Impulses and Any Associated Expert Witness Fees." Appellant had averred in a separate motion that he would set forth an affirmative defense of extreme emotional disturbance to the first-degree murder charge, if Pennsylvania recognized such an affirmative defense. The court denied these motions on June 27, 2002. On the eve of trial, July 31, 2002, Appellant again filed a *pro se* "Petition for Expert Witness Fee." Then–President

proposed expert witness and related the witness's readiness and willingness to appear in court to testify on Appellant's behalf during the penalty phase. Appellant objected to stand-by counsel's assertion that Appellant had signed the petition requesting funds, stated his desire to "withdraw that motion," and concluded his objection by stating "so let's move on." *Id.* at 925–26. The request for funding was denied, Appellant presented no mitigation evidence, and following the penalty phase portion of the trial, the jury returned a sentence of death.

Appellant was represented by counsel on direct appeal. Among other things, Appellant alleged that the court had erred in granting his request to proceed *pro se* at trial and denying his request for psychological evaluation fees. Appellant also alleged that the trial court had erred in denying his motion for recusal. This Court affirmed the judgment of sentence, and in so doing, held that the trial court's colloquy with respect to Appellant's decision to represent himself had properly established that Appellant's waiver of the right to counsel had been knowing and voluntary. *Blakeney,* 946 A.2d at 655–56. We also determined that the trial court did not abuse its discretion in denying the motion for recusal and the request for funds to conduct a psychological examination. *Id.* at 659, 662.

In March 2009, Appellant filed a *pro se* PCRA petition. The Federal Community Defender Office for the Eastern District of Pennsylvania ("FCDO") entered its appearance on behalf of Appellant and, on April 20, 2009, the PCRA court entered an order directing the FCDO to file an amended petition within thirty days. After numerous extensions of time were granted, an amended PCRA petition raising eighteen issues was filed on December 21, 2010.[5] The Common-

Judge Joseph H. Kleinfelter denied the motion on August 1, 2002, "without prejudice of [sic] the Public Defender to retain an expert out of the P.D.'s budget." *Blakeney,* 946 A.2d at 657.

5. On March 3, 2011, Appellant, *pro se,* filed a "Letter in Application" objecting to, and purporting to withdraw, the seventeenth issue raised in the amended PCRA petition filed by the FCDO. The seventeenth issue alleged that "the execution of a brain damaged and chronically mental-

wealth filed a response, and on November 2, 2011, the PCRA court filed notice of its intention to dismiss the amended PCRA petition without a hearing, accompanied by an opinion disposing of all the claims raised and "find[ing] no merit in any of the issues or sub-issues raised in Petitioner's amended PCRA petition that would warrant an evidentiary hearing or any post-conviction relief." PCRA Court Opinion, dated 11/2/11, at 43. Appellant filed objections to the court's notice of its intention to dismiss without a hearing. On January 31, 2012, the court dismissed the objections by order and memorandum opinion, and the instant appeal was filed.[6]

 Under the applicable standard of review, we determine whether the ruling of the PCRA court is supported by the record and is free of legal error. *Commonwealth v. Spotz*, 616 Pa. 164, 47 A.3d 63, 75 (2012) (citing *Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 284–85 (2011)). We apply a de novo standard of review to the PCRA court's legal conclusions. *Id.*

To prevail on a petition for PCRA relief, a petitioner must plead and prove, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include a constitutional violation or ineffectiveness of counsel, either of which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i)

ly ill person, such as [Appellant], would violate the Eighth Amendment and principles of international law that this court is obligated to enforce." Amended PCRA Petition, filed 12/21/10, at 303. In his "Letter in Application," Appellant countered that the terms "severely mentally ill, psychotic disorder, hypomania, hallucinations, brain damaged and chronically mentally ill person" contained in counsel's discussion of issue seventeen and other sections of the brief "do not apply to me," and that the diagnoses represented an "overreach on my legal team's behalf" that was "in direct conflict" with an agreed-upon "appeal strategy." Letter, filed 3/3/11, at 1. Appellant's *pro se* letter suggested that the mental health diagnoses listed above, as set forth in the amended PCRA petition, be replaced with one of "emotional breakdown syndrome ... temporary." *Id.*

6. Judge Cherry, who had presided over Appellant's trial, authored the opinion dismissing Appellant's PCRA petition.

18

and (ii). In addition, a petitioner must show that the claims of error have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2); *Spotz*, 47 A.3d at 76. An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post conviction proceeding." 42 Pa.C.S. § 9544(b).

In this case, appellant waived his Sixth Amendment right to counsel, choosing to represent himself at trial. Such a choice is also guaranteed under the Sixth Amendment, *see Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), subject to an exception, *see Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), which we will address *infra*. The self-representation choice, however, is not without consequences, including that a defendant who knowingly and intelligently waives his right to counsel and represents himself at trial cannot later seek to revive default-ed trial claims by alleging his own ineffectiveness or the ineffectiveness of his standby counsel. *Commonwealth v. Fletcher*, 586 Pa. 527, 896 A.2d 508, 522 (2006); *see also Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 736 (2004).

The universe of challenges available to Appellant, thus, is more limited than in other cases. Generally speaking, any claim deriving from an event at trial could have been challenged at trial and raised on direct appeal. To the extent such a claim was not raised at trial, it is waived under the PCRA, unless an exception applies (*see* discussion *infra*); and since Appellant represented himself at trial, he cannot raise a derivative claim of ineffective assistance of trial counsel on collateral review. Claims respecting appellate counsel's per-formance likewise are more limited, since the universe of claims available on appeal was restricted by trial level defaults chargeable to Appellant himself. Thus, on collateral attack, Appellant is generally limited to faulting appellate counsel for

failing to raise otherwise preserved claims of trial court error or failing to properly litigate those claims that counsel actually raised on appeal. Finally, any potential "layered" claim of counsel ineffectiveness covering trial and appeal is unavailable because appellant exercised his constitutional right to represent himself at trial. *See Fletcher*, 896 A.2d at 522.

 With respect to Appellant's claims of ineffective assistance of appellate counsel, we begin with the presumption that counsel is effective. To prevail on an ineffectiveness claim, Appellant must satisfy, by a preponderance of the evidence, the performance and prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This Court has divided the performance component of *Strickland* into two subparts dealing with arguable merit and reasonable strategy. *Commonwealth v. Baumhammers*, 625 Pa. 354, 92 A.3d 708, 719 (2014); *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975–77 (1987). With regard to "reasonable basis" in the appellate context, "[i]t is well settled that appellate counsel is entitled, as a matter of strategy, to forego even meritorious issues in favor of issues he believes pose a greater likelihood of success." *Commonwealth v. Jette*, 611 Pa. 166, 23 A.3d 1032, 1043 (2011). *See also Commonwealth v. Robinson*, 581 Pa. 154, 864 A.2d 460, 479 n. 28 (2004), *cert. denied*, 546 U.S. 983, 126 S.Ct. 559, 163 L.Ed.2d 470 (2005) ("Th[e] process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.") (quoting *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986). *Accord Jones v. Barnes*, 463 U.S. 745, 746, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). To establish *Strickland/Pierce* prejudice in the appellate representation context, the petitioner must show that there is a reasonable probability that the outcome of the direct appeal

proceeding would have been different but for counsel's deficient performance.

■ The PCRA court has discretion to dismiss a petition without a hearing when the court is satisfied " 'that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings.' " *Commonwealth v. Roney*, 622 Pa. 1, 79 A.3d 595, 604 (2013) (quoting *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 442 (2011), quoting Pa.R.Crim.P. 909(B)(2)). "To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *Roney*, 79 A.3d at 604–05.

### Claims Respecting Appellant's Competency
### (Appellant's issues I–IV)

Obviously recognizing the significant narrowing consequences, for purposes of collateral attack, of Appellant's decision to represent himself at trial, Appellant, now-counseled, raises issues he did not raise at trial by claiming that he was incompetent. The powering assumption is that, so long as he frames his claims in terms of competency, they are not subject to PCRA waiver. Thus, Appellant's first four issues assert that Appellant raised an issue of material fact in his PCRA petition that he was (1) legally incompetent to stand trial, (2) incompetent to waive his right to counsel pretrial, (3) incompetent to waive his right to present mitigation evidence during the penalty phase, and (4) incompetent to represent himself. In pursuing the claims, Appellant variously asserts theories of prior counsel ineffectiveness (raised notwithstanding that he represented himself), trial court error, and violations of his constitutional rights. Obviously, given the standard for competency, there is significant overlap in these four issues, so we discuss them together.[7]

7. Appellant sets forth his first four issues as follows:

■ Although Appellant did not raise his competency to stand trial either at trial or on direct appeal, thus facially implicating the PCRA waiver provision, this Court has held that, "the failure to raise on direct appeal a claim that the appellant was incompetent at the time of trial does not constitute a waiver of that claim for purposes of the PCRA." *Commonwealth v. Brown,* 582 Pa. 461, 872 A.2d 1139, 1153 (2005) (plurality). *Brown* was a plurality decision, but the proposition quoted above garnered a majority view. *See id.* at 1170 (Nigro, J., concurring and dissenting) (agreeing that claims regarding competency to be tried are not subject to waiver provision of PCRA). *See also Commonwealth v. Santiago,* 579 Pa. 46, 855 A.2d 682 (2004) (plurality). *Brown* addressed only the non-waiver of claims involving competency to stand trial, *see Commonwealth v. Fletcher,* 604 Pa. 493, 986 A.2d 759, 778, n. 24 (2009), but two later decisions, in separate capital PCRA appeals involving defendant Mark Spotz, applied the *Brown* decision to embrace unpreserved challenges to claims of competency to waive the right to counsel. *See Spotz,* 47 A.3d at 79, n. 6; *Commonwealth v. Spotz,* 610 Pa. 17, 18 A.3d 244, 262 n. 10 (2011). Accordingly, under that precedent, which is not challenged by the Commonwealth here, Appellant

I. The lower court failed to provide Appellant full and fair post-conviction review.

II. As a result of trial court error and trial counsel's ineffectiveness, no hearing was ever held as to Appellant's competency; Appellant was tried while incompetent and his waiver of counsel and a mitigation presentation were invalid. Appellate counsel was ineffective for failing to raise these claims. The PCRA court erred by denying a hearing and relief.

III. The trial court did not conduct an adequate colloquy before allowing Appellant to waive his rights to counsel and to present mitigating evidence at sentencing, and Appellant's waivers were not knowing intelligent and voluntary. Trial counsel was ineffective for failing to represent their client at the colloquy hearing and appellate counsel ineffectively failed to present these errors properly on appeal.

IV. Permitting Appellant to proceed *pro se* despite mental, emotional and cognitive deficits rendering him incompetent to represent himself resulted in a breakdown of the adversarial proceedings in violation of Appellant's right to counsel and a fair and reliable capital trial and sentencing.

Appellant's Brief at 27, 28, 43, 52.

may raise his competency to stand trial and competency to waive the right to counsel for the first time on collateral review, notwithstanding the trial level default.[8]

As reflected in the concurring opinions of Mr. Chief Justice Castille and Mr. Justice Eakin, both of which are joined by Mr. Justice Stevens, three Justices would overrule the proposition in *Brown* and its progeny that competency challenges are not subject to the PCRA's waiver provision. The same Justices would not expand the judicial exception in *Brown* to embrace Appellant's additional claim of competency to waive mitigation evidence. For purposes of resolution in this case, however, this *per curiam* decision proceeds to the merits of each iteration of Appellant's competency claims, without deciding (or revisiting, as the case may be) whether such claims are subject to statutory waiver. Appellant alleges that indicia of his incompetence manifested "well before [he] waived his right to counsel on January 29, 2001," but he also acknowledges that many of these same indicia arose after his arrest and prior to his psychiatric evaluation, treatment and declaration of competency at MSH. Appellant then argues that "[e]ven if there were insufficient indicia for a competency hearing at the time of the waiver [of counsel] colloquy, there surely were subsequently." As indicators of his alleged mental illness following his waiver of the right to counsel, Appellant points to, *inter alia*, his *pro se* double jeopardy motion, where he alleged he had been tried by his peers at Dauphin County Prison prior to his hospitalization, and his insistence on the presentation of an innocence defense based on a theory that Officer Vernouski killed the infant and that Appellant was the victim of a conspiracy and cover-up. Appellant also notes his statements to the trial jury that "the spirit of God" had spoken to him on the night of the murder. Appellant argues that these "startling choices and comments cannot be passed off as poor lawyering by a *pro se* defendant." Appellant argues that, viewed "in the context of the record as a whole" his conduct

8. Appellant also couches the competency arguments in terms of prior counsel ineffectiveness, including that of trial counsel. As explained, claims of trial counsel ineffectiveness are unavailable.

prior to and during trial "raised questions about whether Appellant's strategies and his perceptions of the law, of the trial proceedings, and of the situation before him were impaired by mental illness and that his choices were influenced by those impaired perceptions." Appellant's Brief at 30–33.

A defendant is presumed to be competent to stand trial, and the burden is on the defendant to prove by a preponderance of the evidence that he is incompetent to do so. *Brown*, 872 A.2d at 1156. This Court has recognized that the competency standard for waiving the right to counsel is the same as, and not higher than, the competency standard for standing trial. *Spotz*, 18 A.3d at 266. If a court finds a defendant incompetent to waive the right to counsel, then the court must also conclude that the defendant is incompetent to stand trial. *Id.* Competency to stand trial is measured by the relationship between counsel and client: To be deemed competent, the defendant needs to have the ability to consult with counsel with a reasonable degree of understanding, in order to participate in his defense, and he must be able to understand the nature or object of the proceedings against him. *See Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 617–18 (2010). The focus is properly on the defendant's mental capacity, *i.e.*, whether he has the ability to understand the proceedings. *Spotz*, 18 A.3d at 266.

Here, the PCRA court dismissed Appellant's claim of incompetency to stand trial without a hearing, in part because the April 2000 report from MSH indicated that Appellant was competent to stand trial, and in part because the court's observation of Appellant's actions and demeanor before and during trial raised no apparent competency issues for the court. With respect to Appellant's claim that the nature of his offenses and his behavior at Dauphin County Prison prior to his involuntary commitment provided evidence requiring a competency hearing, the PCRA court opined:

Petitioner's alleged psychological impairment based upon the events of February 2, 2000 and his confinement at Dauphin County Prison does not ultimately refute the diagnosis made by the trained professionals at Mayview State

Hospital where Petitioner was treated for possible psychological impairments. Prior to being discharged from Mayview, Dr. Usha Gopalani, a psychiatrist at Mayview, declared in a written summary that "[Petitioner] is aware of his charges; he is aware of the need to cooperate in his own defense; and he is aware of the legal proceedings against him. He is also aware of the consequences if found guilty. He is considered competent to stand trial." Moreover, Petitioner does not have any professional diagnosis of his alleged psychological impairment to counter the finding from the professionals at Mayview psychiatric hospital.

PCRA Court Opinion at 10 (citations to record omitted).

The court also considered Appellant's *pro se* submission asserting that he had suffered only a "temporary" emotional breakdown as indicative of Appellant's return to competence following his discharge from MSH. *See* n.1, *supra.* Ultimately, the court stated that it had had no reason to conduct a competency hearing following the report from MSH because the report, coupled with the court's own observations of Appellant's behavior and demeanor both prior to trial and at trial, made it clear "that [Appellant's] competency in understanding the charges against him and his ability to aid in his defense was not an issue." Memorandum Order, dated 1/31/12, at 2. Accordingly, the court determined that the claims of counsel ineffectiveness asserted in Appellant's amended PCRA petition, based on allegations of Appellant's incompetence and the lack of a competency hearing, did not raise a material fact concerning an issue that might entitle Appellant to post-conviction relief.

We see no error in the PCRA court's determination. Appellant was ordered to undergo treatment for his mental health issues under Section 7402 of the Mental Health Procedures Act, 50 P.S. §§ 7101–7503.[9] Following his commitment

9. Section 7402 provides, in pertinent part, as follows:

§ 7402. **Incompetence to proceed on criminal charges and lack of criminal responsibility as defense**

(a) **Definition of Incompetency.**—Whenever a person who has been charged with a crime is found to be substantially unable to understand

to MSH and his treatment there, Appellant was found to be competent to stand trial by the psychiatrist who conducted the relevant examination. Respecting his related claim of incompetency to waive the right to counsel, Appellant points to no fact of consequence occurring after the finding of competency to stand trial that would have indicated the need for another competency evaluation, other than a bald allegation that he

the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent to be tried, convicted or sentenced so long as such incapacity continues.

(b) **Involuntary Treatment of Persons Found Incompetent to Stand Trial Who are Not Mentally Disabled.**—Notwithstanding the provisions of Article III of this act, a court may order involuntary treatment of a person found incompetent to stand trial but who is not severely mentally disabled, such involuntary treatment not to exceed a specific period of 60 days. Involuntary treatment pursuant to this subsection may be ordered only if the court is reasonably certain that the involuntary treatment will provide the defendant with the capacity to stand trial. The court may order outpatient treatment, partial hospitalization or inpatient treatment.

. . .

(d) **Hearing; When Required.**—The court, either on application or on its own motion, may order an incompetency examination at any stage in the proceedings and may do so without a hearing unless the examination is objected to by the person charged with a crime or by his counsel. In such event, an examination shall be ordered only after determination upon a hearing that there is a prima facie question of incompetency. Upon completion of the examination, a determination of incompetency shall be made by the court where incompetency is established by a preponderance of the evidence.

(e) **Conduct of Examination; Report.**—When ordered by the court, an incompetency examination shall take place under the following conditions:

. . .

(4) A report shall be submitted to the court and to counsel and shall contain a description of the examination, which shall include:

(i) diagnosis of the person's mental condition;

(ii) an opinion as to his capacity to understand the nature and object of the criminal proceedings against him and to assist in his defense;

(iii) when so requested, an opinion as to his mental condition in relation to the standards for criminal responsibility as then provided by law if it appears that the facts concerning his mental condition may also be relevant to the question of legal responsibility; and

(iv) when so requested, an opinion as to whether he had the capacity to have a particular state of mind, where such state of mind is a required element of the criminal charge.

50 P.S. § 7402(a)–(b), (d)–(e).

had stopped taking the psychotropic medication he had been prescribed upon discharge from MSH. Accordingly, the PCRA court did not err in finding that Appellant did not present a material fact warranting a PCRA hearing on the allegation that a competency hearing was required at the time he waived his right to counsel on January 29, 2001.

Moreover, the very fact that Appellant proceeded to represent himself at his capital trial is of obvious significance, in assessing retrospective claims of incompetence. This is not a case where the defendant sat silently throughout the trial. Instead, the trial court—and standby counsel and the prosecutor, both officers of the court, for that matter—had ample opportunity to assess Appellant's capabilities in relation to the standard required to establish competence.

Further, there is no merit in Appellant's argument that his conduct and demeanor in litigating his case *pro se* raised a material fact regarding his competency. With respect to Appellant's *pro se* motion alleging a double jeopardy violation, for example, the trial court noted that although the motion was frivolous, it nonetheless, "demonstrated to this [c]ourt that [Appellant] at least understood the concept of double jeopardy and how it [might] ultimately [aid] in his defense." Memorandum Order at 2, n.2. The double jeopardy claim was indeed frivolous, based as it was on an allegation that Appellant had been tried by a jury of his peers while incarcerated at Dauphin County Prison, but frivolous claims are not uncommon when defendants untrained in the law represent themselves. Nor, unfortunately, is it unusual to see fanciful or absurd claims raised by *pro se* litigants. The act of filing a frivolous motion, whether alleging double jeopardy or otherwise, does not necessarily suggest incompetence any more than it suggests a lack of legal training. And, this is particularly so where the trial court had the benefit of a report and finding of competency in the report from MSH and the court's own observation. The double jeopardy motion did not raise an issue of material fact regarding Appellant's competency.

For similar reasons, Appellant's defense strategy of claiming that Officer Vernouski killed the child did not raise a

question of incompetence such as would require a competency hearing or further PCRA review. The only persons in the stairwell to actually witness the killing were Appellant and Officer Vernouski.[10] While Appellant's defense strategy was perhaps untenable in light of the totality of the available evidence, the implausibility of a defense does not suggest incompetence in the legal sense. Defendants alleged to have been caught in the act of a crime have limited options in asserting innocence, and Appellant was not obliged to concede his own guilt; attempts to shift the blame to police, or to others at the scene, are not uncommon (and no doubt are occasionally accepted as raising reasonable doubt). Thus, Appellant's adherence to his claim of innocence did not prove the need for a competency evaluation. This is even more so given the record evidence of Appellant's handling of his own representation, during which he filed pre-trial motions and a pre-trial appeal, actively participated in voir dire, performed direct- and cross-examination of witnesses, and testified on his own behalf. Indeed, Appellant attempted at trial, albeit unsuccessfully, to show that the blood stains at the scene, including the blood stains in the stairwell and on his clothing, precluded an inference that he had killed the baby. These record circumstances show that, at the time of trial, he was not substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense. Accordingly, we hold that the amended petition in this matter did not raise a material fact requiring an evidentiary hearing on the competency claims. Nor did the court err by failing to order a competency hearing *sua sponte*, and Appellant's allegation to the contrary raises no material fact requiring a post-conviction hearing or relief.

Appellant also claims that the trial court's colloquies regarding Appellant's waiver of his right to counsel pre-trial and his right to present evidence of mitigating circumstances during

**10.** Officer David Kyle, who was behind Officer Vernouski in the hallway outside the stairwell, testified that Appellant was out of his view. Moreover, Officer Kyle testified that he had briefly turned away to give another officer a "description of what was happening, and that is when the first shot rang out." N.T. Trial, 8/7/02, at 734.

the penalty phase were inadequate because they did not sufficiently probe whether he was competent to make those decisions. Appellant presents a derivative claim of ineffectiveness on the basis that counsel should have protected him from making an invalid waiver. Whether a defendant is competent to waive his rights, and whether he knowingly, intelligently, and voluntarily does so, may be distinct matters. *Commonwealth v. Wright*, 621 Pa. 446, 78 A.3d 1070, 1079 (2013) (citing *Commonwealth v. Puksar*, 597 Pa. 240, 951 A.2d 267, 288 (2008)) (differentiating between mental competence to waive mitigation, and validity of waiver as assessed by adequacy of waiver colloquy).

■■■ The PCRA court determined, and the Commonwealth now argues, that Appellant's underlying claim, challenging the adequacy of the trial court's colloquy regarding Appellant's waiver of the right to counsel, has been previously litigated. We agree. This Court determined on direct appeal that Appellant's waiver of his right to counsel had been knowing, intelligent and voluntary, and that the colloquy had been probing, extensive, and had covered all the relevant areas of inquiry. *See Blakeney*, 946 A.2d at 655–56.[11] Appellant's derivative claim, however, that counsel rendered ineffective assistance by failing to protect him from making an invalid waiver of the right to counsel, has not been previously litigated. *See Commonwealth v. Hanible*, 612 Pa. 183, 30 A.3d 426, 442 (2011) (noting that Sixth Amendment claim alleging ineffective assistance of counsel raises issue cognizable under PCRA even if underlying ineffectiveness claim has been previously litigated) (citing *Commonwealth v. Collins*, 585 Pa. 45,

11. Among other things, we cited the "probing colloquy" standard set forth in *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1335 (1995), and held that the colloquy here "confirmed that appellant, among other things, wished to represent himself, was aware that he had the right to an attorney, was aware of the elements of the charges against him and that the Commonwealth was seeking the death penalty, understood that waiver of court-appointed counsel meant a waiver of the attorney's expertise and experience, understood the meaning of a 'knowing and voluntary' waiver of court-appointed counsel, and knew that he would be held to the same standards as a licensed attorney." *Blakeney*, 946 A.2d at 655 (footnote omitted).

888 A.2d 564, 573 (2005)). Nevertheless, because it has been established that Appellant's waiver of his right to counsel was knowing, intelligent, and voluntary, his claims of ineffectiveness based on the alleged failure of counsel to protect him from making an invalid waiver lack arguable merit *ipso facto*, and thus we determine that the PCRA court properly dismissed the claim. *See Commonwealth v. Simpson*, 620 Pa. 60, 66 A.3d 253, 268 (2013) (citing *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 31 (2008) (where underlying substantive claim fails, "ineffectiveness allegations *ipso facto* lack arguable merit")). Thus, we determine that Appellant raised no genuine issue of fact with respect to this claim, and therefore the PCRA court properly dismissed the claim without a hearing.

Related to the adequacy of the waiver of counsel colloquy, Appellant also alleges direct appeal counsel's ineffectiveness in litigating the claim. Appellant avers that "there are readily identifiable reasons why the trial court's colloquy was inadequate to sustain a waiver of counsel. Appellate counsel, however, failed to bring those specific deficits to this Court's attention." Appellant's Brief at 54. Appellant cites this Court's observation on direct appeal that in his brief, he did "not identify, let alone elaborate upon, any information or right that the court failed to explain to him" in support of his challenge to the colloquy. *Blakeney*, 946 A.2d at 656. Appellant also argues that appellate counsel should have known that appellant's waiver was not knowing, intelligent and voluntary because he was incompetent.

The PCRA court determined the claim was previously litigated, but this is not so because Appellant—at least in theory—is raising a distinct Sixth Amendment claim focusing on appellate counsel. *See Collins*, 888 A.2d at 570. Nevertheless, the claim fails. Although posed as an attack on appellate counsel's failures, appellant is actually challenging his own failure at trial to object to an allegedly deficient colloquy. As we have explained, by choosing to represent himself at trial, appellant himself is responsible for that trial level default, and he does not state a colorable claim of appellate counsel ineffectiveness.

Appellant also challenges the performance of standby counsel, contending that irreconcilable differences had arisen between standby counsel and himself, which undermined his decision to waive the presentation of mitigation evidence. Appellant then claims appellate counsel was ineffective respecting his waiver of mitigation because counsel failed to recognize Appellant's incompetency, failed to recognize deficiencies in the court's colloquy, and failed to recognize that Appellant's relationship with standby counsel precluded him from making a reasoned waiver decision.

Respecting standby counsel, this Court has recognized that when a defendant elects to proceed at trial *pro se*, the defendant, and not standby counsel, is counsel of record and is responsible for trying the case. *Spotz*, 47 A.3d at 83. The limited role of standby counsel is essential to satisfy the United States Supreme Court's directive that a defendant's choice to proceed *pro se* "must be honored out of 'that respect for the individual which is the lifeblood of the law' " even when the defendant acts to his own detriment. *Id.* (citing *Faretta*, 422 U.S. at 834 n. 46, 95 S.Ct. 2525). This understanding undergirds our jurisprudence, which dictates that a defendant who chooses to represent himself cannot obtain post-conviction relief by raising a claim of his own ineffectiveness or that of standby counsel. *Id.* Here, Appellant's post-conviction attempt to challenge standby counsel's effectiveness at trial, for allegedly permitting him to invalidly waive his right to present mitigation evidence in the face of an allegedly inadequate colloquy during the penalty phase, is not cognizable.

Respecting appellate counsel, we note that, generally, a challenge to the validity of a waiver of presentation of mitigation evidence is assessed by examining the thoroughness of the colloquy to ensure that the defendant fully understood the nature of the right and the consequences of waiving the right. *Puksar*, 951 A.2d at 288. Although there exists no constitutional right to a colloquy before a defendant's waiver of presenting mitigating evidence, *id.* at n. 11, the colloquy is meant to ensure that a defendant's waiver is knowing, intelli-

gent, and voluntary. *Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1028 (2007).

During the colloquy, the court received Appellant's affirmative response to its query of whether he understood that the jury would be required to sentence him to death if he did not present mitigating circumstances and the Commonwealth proved just one aggravating circumstance. The court also confirmed that Appellant had spoken to standby counsel and had received their advice regarding the waiver. Additionally, Appellant twice indicated to the court during the colloquy that he was making the decision not to present mitigation evidence as a matter of personal, religious preference. Appellant concedes that the court "warned Appellant about the consequences of failing to present mitigating evidence in the face of the Commonwealth's proof of aggravating factors," and that "the court focused on whether Appellant's waiver of a mitigation presentation was knowing, intelligent, and voluntary." Nevertheless, Appellant claims that the colloquy was "perfunctory and inadequate to the task, given all the circumstances of the case, including Mr. Blakeney's known mental health history and his obviously deteriorated mental state." Appellant's Brief at 47. Appellant argues that the colloquy was inadequate because even though Appellant stated, among other things, that he had consulted standby counsel and understood that the jury's finding of even one aggravating circumstance in the absence of mitigation evidence would require that the jury impose a sentence of death, his waiver decision "was not made knowingly or with any appreciation for the consequences of failing to introduce such evidence, [because] he was incompetent at the time of his purported waiver." *Id.* at 53.

We disagree, and note that Appellant's argument involves circular reasoning, as it depends upon the premise that Appellant was incompetent to voluntarily and knowingly waive his right to present mitigating evidence. Appellant also posits a *non sequitur*, as he implies that the colloquy was inadequate because it did not sufficiently probe his alleged incompetence, and thus, his waiver was not knowing and voluntary. By Appellant's logic, no amount of explanation or inquiry by the

court would have been sufficient to ascertain a knowing and voluntary waiver because he was incapable of making a knowing and voluntary waiver.

In any event, our inquiry here is whether Appellant raised a genuine issue of material fact regarding appellate counsel's failure to challenge the thoroughness of the colloquy on direct appeal such that a PCRA hearing was warranted. We answer that question in the negative. As noted above, there was nothing in the record to support an appellate claim premised upon incompetency, and Appellant's failure to lodge objections at trial further masked any such claim. Moreover, the competency standard for waiving the right to present mitigation evidence mirrors the standard for competency to stand trial and to waive the right to counsel, *Puksar*, 951 A.2d at 288–89, and we have already determined that Appellant was competent to stand trial. On this record, we are satisfied that the PCRA court properly dismissed, without a hearing, Appellant's claim of appellate counsel ineffectiveness.

Appellant next alleges that he was denied his fundamental right to a fair trial "because he was permitted to represent himself despite his incapacity to do so." Appellant's Brief at 58. Appellant concedes that he "raised this [c]laim for the first time" in his PCRA petition. Appellant's Brief at 62. Nonetheless, Appellant asserts that the claim is "neither previously litigated nor waived[,]" because he has "raised a claim of ineffective assistance of appellate counsel" in his discussion of the issue. *Id.* We have reviewed the petition with respect to this claim, and nowhere did Appellant specifically allege the ineffectiveness of any counsel; any allegation of ineffectiveness was merely implied by his recitation of trial counsel's alleged failures to pursue a different course than that actually taken. At its core, the substantive claim of trial court error alleges unfairness due to Appellant's alleged incompetence to represent himself. Assuming solely for purposes of decision that such a claim falls within the exception to PCRA waiver recognized in *Brown* and *Spotz,* we will address the merits.

Appellant relies on *Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), a case in which the defendant Edwards, a diagnosed schizophrenic, was represented by counsel at his trial on charges of attempted murder and battery. The trial court had determined that Edwards was competent to stand trial, but denied his request to proceed *pro se*. Referring to Edwards's lengthy record of psychiatric reports, which indicated active mental illness interspersed with periods of competence, the trial court determined that Edwards still suffered from schizophrenia, and concluded that "[w]ith these findings, he's competent to stand trial but I'm not going to find he's competent to defend himself." *Id.* at 169, 128 S.Ct. 2379 (citation to record omitted).

Edwards subsequently appealed to Indiana's intermediate appellate court, which held that the trial court's refusal to permit Edwards to represent himself deprived him of his constitutional right of self-representation, and the Indiana Supreme Court affirmed on the rationale that United States Supreme Court precedent required the state to allow Edwards to represent himself.[12]

The High Court granted *certiorari* and reversed, noting that even where a defendant is competent to stand trial, he may not necessarily be competent to act as his own counsel, and that "the trial judge ... will often prove best able to make ... fine-tuned mental capacity decisions, tailored to individualized circumstances of a particular defendant." *Id.* at 177, 128 S.Ct. 2379. The Court also stated that "insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial." *Id.* at 176–77, 128 S.Ct. 2379. Thus, the Court reasoned:

> We consequently conclude that the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks

12. Specifically, the Indiana Supreme Court cited to *Faretta*, 422 U.S. at 835–36, 95 S.Ct. 2525 and *Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993).

to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky [v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (*per curiam*) (holding that competence to stand trial depends on whether the defendant has rational and factual understanding of the proceedings and sufficient present rational ability to consult with counsel) ] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

*Id.* at 177–78, 128 S.Ct. 2379.

Assuming for decisional purposes that the *Edwards* rule, which was announced five years after Appellant's trial, applies retroactively (the Supreme Court has not yet decided that point), it is apparent that it does not entitle Appellant to relief. The *Edwards* decision did not mandate a particular action (*i.e.*, require trial courts to appoint counsel), but instead, the Court permitted states to refuse to allow certain defendants to proceed *pro se* notwithstanding *Faretta*, within the trial court's discretion, and in factual circumstances much different from those present here. In *Edwards*, the defendant had a significant, long-standing mental health history and a diagnosis of schizophrenia for which he had been repeatedly treated; here, in contrast, the PCRA court noted "that [Appellant's] formal diagnosis from Mayview State Hospital ... indicates cognitive deficits[,] not serious mental illness." PCRA Court Opinion at 42 n. 16. Moreover, the court here opined that its observation of Appellant's behavior and demeanor before and at trial did not raise concerns for the court regarding his mental health, whereas in *Edwards*, the opposite was true.[13]

▬▬▬ We acknowledge that where a court has concerns that a defendant seeking to represent himself may be mentally

**13.** In *Edwards*, the defendant was well-known to the court, as he had been re-tried following a jury's inability to reach a verdict during a first trial. Moreover, "his mental condition had ... become the subject of three competency proceedings and two self-representation requests, mostly before the same trial judge[.]" *Edwards*, 554 U.S. at 167, 128 S.Ct. 2379.

incompetent to do so, even though the defendant is competent to stand trial, the court may, in its sound discretion, deny a request to waive the right to counsel and proceed *pro se* on the ground that to do otherwise would compromise the defendant's right to a fair trial.[14] But here, the trial court did not abuse its discretion in granting the request to proceed *pro se*, where the court noted that Appellant had not been diagnosed as suffering from a serious mental illness and the court's own, extended observations of Appellant did not raise a concern regarding Appellant's competence.

Certainly, Appellant's decision to represent himself at his capital trial was unwise and worked to his severe detriment. As an untrained layman, his *pro se* handling of his case was poor and almost certainly not on par with the defense he might have received had he chosen to be represented by counsel who had been appointed for that purpose. However, the right to self-representation is constitutionally guaranteed absent exceptional circumstances not present here, and we hold that Appellant has not raised a genuine issue that his mental status vis-à-vis his ability to represent himself compromised his right to a fair trial.

## Waived, Previously Litigated and Unsupported Claims

Appellant next raises several claims that have been waived, previously litigated, or insufficiently presented, as explained below.[15]

14. We make no determination with respect to what competency standard might be employed to establish an inability to represent oneself.

15. Appellant's remaining issues are stated as follows:

V. The trial court erred by denying [Appellant] funding for a mental health expert; appellate counsel ineffectively presented this claim. VI. Appellant's conviction is null and void, and Appellant's constitutional rights were violated, because the trial court lacked jurisdiction when it proceeded to trial and the court and the prosecutor engaged in unrecorded *ex parte* proceedings to address jurisdictional concerns outside the presence and hearing of Appellant. Appellate counsel was ineffective. VII. The prosecution used its peremptory strikes in a discriminatory manner against women and minorities; direct appeal counsel was ineffective for failing to raise this claim on appeal.

### a. Biased jurors (Appellant's issue VIII)

Appellant makes the bald allegation that two specific jurors failed to disclose personal biases that impaired their ability to be fair and impartial. Specifically, Appellant alleges that juror Eric Hicks failed to disclose that he had known a key Commonwealth witness, Maurice Swanson.[16] Appellant also alleges that another juror, Dawna Peters, failed to disclose that her father was a police officer and a friend of the trial judge. The PCRA court determined, among other things, that Appellant had waived these claims by failing to raise them previously. In response, Appellant states that "[t]he court's waiver finding is ... unavailing." Appellant's Brief at 83. Appellant contends that "seating a biased juror constitutes structural error. Thus, general principles of waiver are inapplicable." *Id.*[17]

> VIII. Two jurors' failure to disclose biases impairing their ability to be fair and impartial violated Appellant's Sixth, Eighth and Fourteenth Amendment rights and corresponding provisions of the Pennsylvania constitution.
> IX. Appellant's trial and sentencing were conducted by a biased tribunal.
> X. Relief or remand for reconstruction of the record is required because no record exists of significant portions of the trial proceedings, and Appellant was denied his right to be present for a portion of these proceedings in violation of the Sixth, Eighth and Fourteenth Amendments and his state constitutional rights.
> XI. The court and the prosecution denied Appellant the tools necessary to present his defense in violation of the Sixth, Eighth and Fourteenth Amendments and his state constitutional rights.
> XII. By their acts and failures to act, stand-by counsel hindered and obstructed [Appellant's] constitutional rights; the court erred by denying Appellant co-counsel.
> XIII. Appellate counsel's conflict adversely affected his representation.
> XIV. Appellant is entitled to relief from his conviction and sentence because of the cumulative effect of the errors described in this Brief.
> Appellant's Brief at iii–iv. For ease of discussion we will consider these issues in non-sequential order.

16. Maurice Swanson, the teenage son of victim Duana Swanson, was in the apartment on the night of the crimes and fled shortly after Appellant arrived. Appellant alleges that Maurice Swanson discussed the events of that night with Mr. Hicks.

17. Appellant appears to rely on *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 734 n. 18 (2000), to support his position that the instant claim is not subject to the PCRA waiver provision. The perti-

■ Appellant's structural error argument fails. The relaxed waiver doctrine was abrogated with respect to capital PCRA appeals in *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693 (1998). The PCRA specifically provides that an issue has been waived if it could have been raised but was not raised before trial, at trial, on appeal or in a prior state postconviction proceeding. *Commonwealth v. Chmiel*, 612 Pa. 333, 30 A.3d 1111, 1127 (2011) (citing 42 Pa.C.S. § 9544(b)). No objection to the objectivity or impartiality of the jurors identified at the PCRA level was raised at trial or on direct appeal. Accordingly, we hold that the PCRA court properly dismissed this claim without a hearing.

### b. Recusal (Appellant's issue IX)

On direct appeal, Appellant alleged that the trial judge erred in denying his motion for recusal, a motion which alleged that the trial judge could not be impartial because he had been a member of the Dauphin County Prison Board when Appellant's civil suit against the prison had been pending, and also because the trial judge had signed documents related to Appellant's divorce proceedings. This Court determined on direct appeal that the claim of error had no merit, and held that "[t]he record reveals that Judge Cherry was in fact, fair and impartial, and indeed that he demonstrated a great deal of patience when interacting with the *pro se* appellant." *Blakeney*, 946 A.2d at 662. In his amended PCRA petition, Appellant alleged that appellate counsel was ineffective in his presentation of the issue on appeal. The PCRA court dismissed the claim without a hearing on the basis that the underlying issue had been previously litigated and because the claim of appellate counsel ineffectiveness was based on nothing more than bald assertions.

Although the underlying claim of trial court error respecting recusal has been previously litigated, Appellant's deriva-

nent holding in *Basemore* is not that a claim implicating "structural error" is non-waivable, but that claims of error that "impact upon the fundamental fairness of a trial[,] are not subject to conventional harmless error or prejudice analysis." *Id.*

tive Sixth Amendment claim of appellate counsel's ineffectiveness for failing to properly present the claim on direct appeal remains cognizable under the PCRA. *See Hanible*, 30 A.3d at 442; *Collins*, 888 A.2d at 573.

▇▇▇ Here, the gravamen of Appellant's argument with respect to recusal is the same as that raised on direct appeal. To his previously litigated allegation of judicial partiality, Appellant now adds, among other things, that appellate counsel failed to argue additional allegedly specific and dispositive facts, including that the trial judge showed bias by not permitting Appellant to subpoena prison records and by denying his motion for transfer to another prison. Appellant then alleges that appellate counsel "could have [had] no reasonable basis for failing to raise [the claim] fully and properly before the court." Appellant's Brief at 86. In our view, these additional allegations do not support a claim of judicial partiality, such that direct appeal counsel was obliged to add these points, nor has Appellant shown that these points, if added, would likely have led to relief on appeal. Thus, the PCRA court properly denied this claim of ineffectiveness without a hearing.[18]

We move now to Appellant's remaining claims.

### Role of standby counsel—hybrid representation (Appellant's issue XII)

Appellant next argues that standby counsel interfered with Appellant's presentation of his defense by "interjecting himself in a harmful and injurious manner" throughout the trial. Appellant's Brief at 94. Conceding that there is no right to hybrid representation, and ignoring that he waived his right to counsel and chose to represent himself, Appellant now claims he was entitled to "co-counsel," not merely standby counsel, and that the court abused its discretion when it denied his request for co-counsel who might "assume some of the tasks of representation." *Id.* at 95. Appellant also alleges appellate

18. Because the PCRA court properly dismissed the issue based on Appellant's failure to satisfy the reasonable basis prong, we do not specifically determine, although we could, that Appellant's exceptionally thin claim of ineffectiveness does not satisfy the arguable merit prong.

counsel's ineffectiveness for failing to raise this issue on appeal.[19]

Appellant cites to three instances where standby counsel allegedly interfered with his *pro se* representation, but fails to explain how these instances negatively affected the trial. Nor does he support his claim of appellate counsel ineffectiveness with any developed analysis. With respect to the claim Appellant preserved at trial, Appellant argues that "[a]lthough there is no case law that holds that a trial court must appoint co-counsel to a *pro se* litigant pursuant to Article I, § 9, [Appellant] asks that this Court reconsider its position and recognize that the language of the Pennsylvania Constitution, which states, 'In all criminal prosecutions the accused hath a right to be heard by himself **and** his counsel,' provides for such co-counseling through its use of the conjunctive 'and.'" Appellant's Brief at 94 n.19 (emphasis in Appellant's Brief). Appellant offers no analysis in support of this novel proposition under *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991) (setting forth preferred four-factor analysis for issues implicating Pennsylvania Constitution), and thus, he has not shown what appellate counsel was supposed to argue in support of the proposition for a new rule.

The trial court here properly appointed Appellant's former attorneys (former guilt-phase and penalty-phase counsel) as standby counsel, not as co-counsel, for the sole purpose of being available to Appellant for consultation and advice pursuant to Pa.R.Crim.P. 121(D).[20] This Court has recognized the limited role of standby counsel. *See Spotz*, 47

19. The record reflects that Appellant filed a *pro se* pre-trial motion requesting that the court provide him with *"amicus curiae"* to provide partial "assistance of counsel" and to "participate in different areas of the defense." N.T. Hearing, 6/27/02, at 13. The court denied the motion and noted Appellant's exception to that ruling. We will presume for purposes of decision that Appellant thus preserved a claim of trial court error and that appellate counsel could have renewed the issue on direct appeal.

20. Appellant objected to the role standby counsel would fulfill, and a hearing was held on March 8, 2001, specifically to address Appellant's concerns about standby counsel. At the hearing, the court denied Appellant's request that his standby counsel be replaced with new counsel.

A.3d at 83. Consistent with that limited role, standby counsel cannot be subject to claims of ineffective assistance of counsel. *Id.* Moreover, the appointment of standby counsel does not imply or authorize hybrid representation. *Id.* (citing *Commonwealth v. Ellis*, 534 Pa. 176, 626 A.2d 1137, 1138–39 (1993)). Indeed, no defendant has a constitutional right to hybrid representation, either at trial or on appeal. *Commonwealth v. Padilla*, 622 Pa. 449, 80 A.3d 1238, 1259 (2013).

With respect to Appellant's preserved claim of entitlement to co-counsel at trial, Appellant argues that *Ellis* suggests "that a trial court may exercise its discretion to allow such representation" to a *pro se* defendant. Appellant's Brief at 95. Renewing an aspect of his competency claims, Appellant says that co-counsel was required because his thought processes at trial were "disorganized and irrational" and "simply [that] Appellant was overwhelmed." *Id.* Again, our cases make clear that there is no recognized right to hybrid representation; appellate counsel cannot be faulted for failing to forward a claim of a right to such representation.[21]

### Lack of jurisdiction—Reconstruction of the record (Appellant's issues VI and X)

Although posed as two separate claims, these two issues are intertwined and we shall discuss them together. Appellant

---

21. Appellant's counseled brief to this Court also contains a separate, unrelated issue, raised entirely *pro se* by Appellant, questioning whether he has a fundamental right to have his appeal held in abeyance while he seeks redress via private criminal complaint or federal remedy based on allegations that the police witnesses at trial offered perjured testimony. Counsel claims that Appellant has insisted on inclusion of this issue in his brief. Counsel styles this *pro se* issue as "Mr. Blakeney's Requested Preliminary Question," and sets it apart from the counseled appellate issues in the brief. Appellant's Brief at 23–25.

Again, this Court [has] made clear that a criminal defendant "represented by counsel is not entitled to 'hybrid representation'—*i.e.*, he cannot litigate certain issues *pro se* while counsel forwards other claims." *Commonwealth v. Tedford*, 598 Pa. 639, 960 A.2d 1, 10 n. 4 (2008). This is especially true on collateral review, and "courts considering PCRA petitions [will not be required] to struggle through the *pro se* filings of defendants when qualified counsel represent those defendants." *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 302 (1999). As Appellant is represented by the FCDO, we shall not consider the *pro se* question separately set forth in the brief.

claims that the trial court lacked jurisdiction over his case
once he filed in the Superior Court his pre-trial petition for
permission to appeal the trial court's denial of his double
jeopardy motion. Appellant contends that his petition acted
as an automatic stay of the trial proceedings because the trial
court did not state in its initial order that the double jeopardy
motion was frivolous. Appellant cites this Court's decision in
*Commonwealth v. Orie*, 610 Pa. 552, 22 A.3d 1021 (2011) (*per
curiam*), as support for his position that an automatic stay was
in effect, and he claims that appellate counsel rendered inef-
fective assistance for failing to raise this jurisdictional issue.

Appellant separately claims that he was denied due process
because some sidebar discussions at trial were unrecorded; he
claims that one of those unrecorded sidebar conferences, to
which he was not privy, involved discussions regarding the
Superior Court's disposition of his double jeopardy petition.
He then alleges appellate counsel's ineffectiveness for failing
to ensure that the record was complete. In all, Appellant
alleges that there were at least four instances during trial,
"including a number of important instances," where the trial
court conducted sidebar discussions off the record. Appel-
lant's Brief at 87. Appellant alleges that one of the unrecord-
ed sidebars reflected that "Appellant was not permitted to
participate, and instead was forced to sit at counsel table while
standby counsel and the prosecutor engaged in a discussion
with the [c]ourt." *Id.* (citing N.T., 8/5/02, at 416). Appellant
claims that his rights to due process were violated by his lack
of inclusion in that sidebar, and because the incomplete record
made effective appellate review impossible. Appellant adds
that appellate counsel rendered ineffective assistance "for
failing to ensure that the record was complete." *Id.* The
PCRA court concluded that the due process claim would have
been waived on direct appeal because Appellant, acting *pro se*,
had never objected to any unrecorded sidebars, and that
appellate counsel cannot be deemed ineffective for failing to
raise an unpreserved claim of alleged trial court error on
direct appeal. Appellant counters that he did object to the

one specific sidebar in which he was not permitted to partici-pate.[22]

Preliminarily, we note that the trial court was correct that, to the extent Appellant failed to object to the unrecorded sidebars, the defaulted due process claims were unavailable to counsel on direct appeal. *Fletcher*, 896 A.2d at 522. What is left is the claim of ineffective assistance of appellate counsel respecting the specific unrecorded sidebar to which Appellant objected. That sidebar concerned the status of Appellant's petition for permission to appeal from the denial of his double jeopardy motion. The record shows that several hours before that sidebar took place, the court explained to Appellant on the record that it was attempting to determine the status of his petition for permission to appeal, as the decision on the petition could potentially result in a stay of the trial proceed-ings.[23]

Several hours later, the following exchange took place:

THE COURT: May I see counsel.

**22.** Appellant fails to identify at what point in the trial the other unrecorded sidebars occurred or what their import might have been.

**23.** The record reflects, in relevant part, that the following exchange occurred at 8:50 a.m. on 8/5/02:

THE COURT: For the record, we are attempting to reach Superior Court this morning to get an answer on what they are doing with [Appellant's] petitions and when we hear, get that answer, we will resolve that issue. I take it that is one of the issues you wanted to raise. Is that correct?

[APPELLANT]: Yes, sir, but I—. . . I have something else.

THE COURT: You are interrupting me.

[APPELLANT]: I am sorry.

THE COURT: . . . [W]e are going to wait. My law clerk is diligently talking, and he has talked to some people who don't have a clue, so he is going to be talking to the Judge's law clerk directly and that will hopefully give us an idea and hopefully they will go to the Judge and we will find out what is going on. What is the next thing you have to say?

[APPELLANT]: Just to bring to your attention there are a couple papers accidentally not given and they [standby counsel] will be sending that over [to Superior Court]. . . . They forgot a couple pages. [Standby counsel] forgot a couple of pages of the original. . . .

THE COURT: Well, that won't effect [sic] whether they are going to grant the stay. . . .[.]

N.T. Trial, 8/5/02, at 364–65.

(Whereupon, a discussion was had off the record)

[APPELLANT]: Objection.

THE COURT: The issue I am talking about with counsel is our attempts to find out what the Superior Court is doing in your case.

[APPELLANT]: Thank you.

THE COURT: I am directing the District Attorney to inquire about what has been done downstairs. It doesn't affect you in any way. Your objection is overruled. We are in recess until the return of the District Attorney.

N.T. Trial, 8/5/02, at 416.

Appellant offers no specific argument as to what error might have been revealed had this sidebar been transcribed. This Court has recently explained the relevant legal principles applicable to claims of this nature:

The U.S. Supreme Court has recognized that adequate and effective appellate review is impossible without a trial transcript or adequate substitute and has held that the States must provide trial records to indigent inmates. This Court has similarly concluded that a criminal defendant is entitled to "a full transcript or other equivalent picture of the trial proceedings" in order to engage in meaningful appellate review. However, in order to "establish entitlement to relief based on the incompleteness of the trial record, [Appellant] must first make some potentially meritorious challenge which cannot be adequately reviewed due to the deficiency in the transcript."

*Commonwealth v. Sepulveda,* 618 Pa. 262, 55 A.3d 1108, 1149 (2012) (citations omitted).

In *Sepulveda,* on collateral appeal in a capital case, the appellant claimed that his rights to counsel, due process, and meaningful appellate review were denied because a number of sidebars had not been transcribed and counsel had not objected. Noting that the appellant had failed to specify any potentially meritorious claim that could not be adequately developed or reviewed because sidebars had not been transcribed, but instead took an absolutist position, unsupported

by controlling authority, that a "full and accurate" record necessarily includes transcription of all sidebars regardless of their substance, this Court dismissed the claim as meritless. *Id.* at 1150.

Here, Appellant makes a similar, broad-based claim without supporting argument as to why the off-the-record sidebars, including the single one to which he objected, should have been transcribed, other than his claimed entitlement to review every unrecorded discussion to determine whether some unspecified error might have occurred. Appellant has failed to establish his underlying claim of incompleteness of the record. Thus, his claim of ineffectiveness of appellate counsel for failing to challenge the allegedly incomplete record on appeal lacks merit. *Sepulveda, supra.* The PCRA court properly dismissed this claim of counsel ineffectiveness without a hearing, as the claim failed to set forth a material fact requiring additional review.

We likewise see no merit in Appellant's claim that appellate counsel was obliged to raise a claim of a lack of jurisdiction premised upon the double jeopardy petition pending in the Superior Court. First, it is undisputed that Appellant had never previously been tried in any court of law at any time for the crimes at issue. Moreover, Appellant's petition in the Superior Court did not request a stay of the trial proceedings, and the trial court had clearly denied the double jeopardy motion on the basis that it lacked merit. This Court recently explained that where a trial court makes a written statement finding that a pre-trial double jeopardy challenge is frivolous, an appeal as of right will not be permitted because it would only serve to delay prosecution. *Orie*, 22 A.3d at 1025 (citing *Commonwealth v. Brady*, 510 Pa. 336, 508 A.2d 286, 291 (1986)).

The basis for Appellant's claim here is that the trial court's initial order denying the *pro se* motion stated that the motion was "meritless," rather than "frivolous." For this reason, he says, he was entitled to an appeal as of right and an automatic stay, and appellate counsel therefore should have argued that

the trial court had no jurisdiction to try the case. In point of fact, however, the trial court issued a subsequent order making clear that the motion was frivolous, and the Superior Court then denied the petition. Under these circumstances, we do not believe appellate counsel was ineffective for failing to claim that the court lacked jurisdiction to try the case.

While meritless and frivolous are not synonymous terms, the basis for the double jeopardy motion was that Appellant had been tried and acquitted at Dauphin County Prison by a jury of his peers. Whether one characterizes the claim as meritless or frivolous, it is clear that Appellant had no colorable double jeopardy claim, and any stay in the proceedings based on a petition for permission to appeal filed on the eve of trial would only have served to unduly delay Appellant's prosecution. Accordingly, we determine that the PCRA court properly dismissed this ineffectiveness claim without a hearing.

**Funding for Mental Health Expert (Appellant's issue V)**

On direct appeal, this Court determined that the trial court properly denied funding for a mental health expert during the penalty phase. *Blakeney*, 946 A.2d at 657–61. Appellant now claims:

On appeal, appellate counsel challenged only whether the trial court had erred in failing to grant funds for a mental health expert to help with the penalty phase. Because appellate counsel failed to challenge the court's denial of expert assistance for [the guilt phase portion of] trial, and because appellate counsel presented his penalty-phase claim inadequately, Appellant was deprived of his right to the effective assistance of counsel on appeal.

Appellant's Brief at 63.

Appellant's guilt phase claim is primarily based on the trial court's denial of Appellant's pre-trial motions in which he asked for "expert witness fees" and alleged that he wished to assert the affirmative defenses of "extreme emotional disturbance" and "irresistible impulse" that referenced mental

states of duress and heat of passion, as well as provocation.[24] Appellant concedes that the petitions were "inartful," but argues that they adequately conveyed that Appellant recognized that his conduct on the night of the incident "reflected both the effects of alcohol consumption and mental impairments." Appellant acknowledges that the trial court denied the petitions because the psychological states asserted in them were not recognized mental health defenses to first-degree murder in Pennsylvania, but he argues that the court's decision to deny the petitions "was hardly in keeping with the rule that courts should liberally construe *pro se* pleadings." *Id.* at 64–65.

Under Pennsylvania law, *pro se* defendants are subject to the same rules of procedure as are represented defendants. *See Commonwealth v. Williams,* 586 Pa. 553, 896 A.2d 523, 534 (2006) (*pro se* defendants are held to same standards as licensed attorneys). Although the courts may liberally construe materials filed by a *pro se* litigant, *pro se* status confers no special benefit upon a litigant, and a court cannot be expected to become a litigant's counsel or find more in a written *pro se* submission than is fairly conveyed in the pleading. Moreover, the PCRA court dismissed the claim not on the basis that Appellant's request was unintelligible, but because Appellant never brought his sanity into issue during the guilt phase. We acknowledged the same point in our disposition on direct appeal. *See Blakeney,* 946 A.2d at 658 ("Appellant does not suggest here, nor did he suggest below, ... that his sanity was at issue.") Indeed, Appellant's primary defense at trial was one of innocence, blaming a police officer for killing the baby.

Moreover, here, as on direct appeal, Appellant argues that funding for a mental health expert was required under *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). *Ake,* however, requires only that state-paid psychiatric assistance for an indigent capital defendant be made available

24. Appellant suggests that the pre-trial motions at issue impliedly sought funding for a mental health evaluation for the potential penalty phase as well.

during the guilt phase when the defendant makes a threshold showing that his sanity is likely to be a significant factor in his defense. Here, Appellant never suggested that his sanity was at issue, and instead proffered a defense of innocence. Accordingly, the claim that appellate counsel rendered ineffective assistance for failing to assert this claim of trial court error does not raise an issue of material fact, and thus, the PCRA court properly dismissed the claim without a hearing.

Appellant separately asserts that appellate counsel did not properly present the penalty phase claim for mental health funding on direct appeal because counsel argued the claim generally, *i.e.*, that expert mental health assistance is indispensable in any capital murder trial in order to determine whether there is any available mitigation evidence to present. This Court held on direct appeal that Appellant had proffered "no specific argument" to support his claim, and that a successful showing of eligibility for funding would require more than broad-based assertions. *Blakeney*, 946 A.2d at 660. We reiterated that Appellant "made no preliminary showing that his mental state would be a factor during *either* the guilt phase or penalty phase of the trial[.]" *Id.* (emphasis added).

Appellant now claims that "there was more than adequate evidence of record that appellate counsel could have presented to this Court to demonstrate that there was a specific justification and need in this case for mental health expert assistance for both trial [guilt phase] and sentencing [penalty phase] purposes." Appellant's Brief at 70. Appellant alleges that "reports of the crime charged, the Mayview commitment, references to auditory hallucinations of a spiritual guiding voice, Appellant's motions, his difficulty dealing with lawyers, [and] his demeanor in court[,] all indicated that mental health issues were at play[.]" With specific focus on the penalty phase funding issue, Appellant alleges "an expert would have been able to address as well the mitigating aspects of [Appellant's] life history[.]" *Id.* at 68.

The PCRA court determined that the penalty phase claim had been previously litigated. This was error. Al-

though the substantive underlying claim may have been previously litigated, the derivative Sixth Amendment claim that appellate counsel failed to adequately present the claim on direct appeal is cognizable. *Hanible*, 30 A.3d at 442. Nevertheless, the essence of the claim is that there was adequate evidence of record to demonstrate the need to provide for a mental health expert. This argument implicates a trial level failure to so request, a default chargeable to Appellant himself. Additionally, we have already concluded that appellate counsel did not render ineffective assistance by failing to challenge the adequacy of the colloquy regarding Appellant's right to waive the presentation of mitigation evidence. We have also concluded that the colloquy was sufficient to ascertain that Appellant's waiver was knowing, intelligent, and voluntary, and we have rejected the claim that Appellant was incompetent to waive the presentation of mitigation evidence during the penalty phase. Moreover, at trial, Appellant expressly objected to standby counsel's request for funding for a mental health expert during the penalty phase, and a challenge to standby counsel's effectiveness is not available. *See Spotz*, 47 A.3d at 83; *see also Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997, 1026–28 (2007) (where waiver of right to present evidence regarding mitigating circumstances is knowing, intelligent, and voluntary, counsel cannot be deemed ineffective for abiding by restrictions on mitigation imposed by his client). Accordingly, the claim lacks merit and we hold that the PCRA court properly dismissed Appellant's claim of appellate counsel ineffectiveness without a hearing.

### *Batson* Claim (Appellant's issue VII)

Appellant next argues that the Commonwealth improperly used its peremptory strikes in a discriminatory manner against African–Americans and women during the jury selection process, in violation of his right to equal protection under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Appellant alleges appellate counsel ineffectiveness for failing to raise this claim on appeal.

In *J.E.B.*, 511 U.S. at 130–31, 114 S.Ct. 1419 the United States Supreme Court extended the *Batson* decision to hold that intentional discrimination on the basis of gender in selecting the jury violates the Equal Protection Clause. *See Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1211 (2006) (citing *Commonwealth v. Jones*, 542 Pa. 464, 668 A.2d 491, 519 (1995)).

The framework for analyzing a *Batson* claim involves the following three steps:

[f]irst, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712.

*Roney*, 79 A.3d at 619 (quoting *Commonwealth v. Williams*, 602 Pa. 360, 980 A.2d 510, 529–30 (2009)) (citation omitted).

However, if defense counsel fails to raise a contemporaneous *Batson*-type objection at trial, a *Batson* claim is not preserved and is unavailable for purposes of collateral review. *Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 86–87 (2004) (when there is no *Batson* objection during jury selection, post-conviction petitioner may not rely on *prima facie* case under *Batson* ). Instead, on collateral attack, a post-conviction petitioner "bears the burden in the first instance and throughout of establishing actual, purposeful discrimination by a preponderance of the evidence." *Hutchinson*, 25 A.3d at 287; *see also Uderra*, 862 A.2d at 87.

We initially note, and Appellant concedes, that the purported *Batson* "objection" Appellant raised during *voir dire* was "inartful" because he merely "requested" that the court "reseat" two jurors who had been excused by the Commonwealth's use of peremptory strikes, "in the interest of justice

and diversity." Appellant's Brief at 78. The "objection" was not contemporaneous, as it was presented to the court several days after the jurors were excused. Moreover, the request to "reseat" did not expressly assert racial or gender discrimination. Instead, Appellant merely requested that the jurors be brought back for further examination "to see if they weren't tainted over the weekend," after which they might "possibly ... be allowed to resit on the jury." N.T. Voir Dire, at 367. The trial court denied the request, and thereafter, no *Batson* challenge was raised during trial or on appeal.

The PCRA court concluded that at trial, Appellant had never raised a proper *Batson* objection to the Commonwealth's peremptory strikes, but the court addressed the claim nonetheless on the basis of this Court's decision in *Uderra*, 862 A.2d at 82–88. Ultimately, the PCRA court held that Appellant's claim consisted of mere conjecture, and that he failed to establish by a preponderance of the evidence that the prosecution had committed actual and purposeful discrimination in the use of its peremptory strikes.

■■■ Appellant's *Batson* claim is waived. The record confirms the PCRA court finding that no *Batson* objection was raised at trial and the only collateral challenge available in such a circumstance would be a derivative claim of trial counsel ineffectiveness, which indeed would be governed by the collateral review paradigm outlined in *Uderra*. *See, e.g., Sepulveda*, 55 A.3d at 1132 (defaulted *Batson* claim argued through derivative guise of ineffectiveness). But, because Appellant represented himself at trial, that iteration of the claim is not available to him.

Alternatively, the claim is without merit. Appellant argues that he made out "a *prima facie* case of discriminatory intent." Appellant's Brief at 77. In support, Appellant asserts that the composition of the entire venire panel was sixty persons: thirty-five men (four of whom were African–American) and twenty-five women (five of whom were African–American). Appellant also asserts that the prosecution exercised five peremptory strikes: one against an African–American man,

one against an African–American woman, one against a white man, and two against white women.[25] He describes the jury that was seated as including eight white men (two of whom were alternates), two African–American men, five white women, and one African–American woman. On this record, Appellant claims entitlement to relief in the form of a remand for an evidentiary hearing on his *Batson* claim. We disagree.

Contrary to Appellant's assertion that he only had to show a *prima facie* case of discrimination, Appellant in fact has the burden here of establishing actual and purposeful discrimination in the Commonwealth's use of peremptory strikes. Notably, Appellant fails to mention, much less present an argument under, *Uderra*. Moreover, Appellant's efforts to compare characteristics of empanelled jurors with stricken ones are abstract and of very limited value in terms of satisfying his burden of proof on collateral attack. Appellant relies upon bare statistical evidence, focusing on the Commonwealth's strikes in isolation, with no account of the effect that his own peremptory challenges had upon the jury pool. "A raw lack of racial or gender equivalency in a party's use of peremptory challenges alone does [not] prove purposeful discrimination in jury selection, much less discrimination so overt that trial counsel was obliged to object." *Sepulveda*, 55 A.3d at 1132. Appellant also disregards the importance of the fact that the Commonwealth used only one quarter of its peremptory strikes during jury selection, striking three white people (out of five, or more than half) and two men. The bare statistics forwarded by Appellant do not prove intentional discrimination. For these reasons, we hold that the PCRA court properly dismissed this claim without a hearing.

25. Appellant concedes that race- and gender-neutral reasons existed for the Commonwealth's strike of the African–American woman. Moreover, Appellant has abandoned the claim set forth in his amended PCRA petition that appellate counsel rendered ineffective assistance for failing to challenge as unconstitutional the Dauphin County jury selection procedure. Appellant had alleged below that the procedure systematically excluded minorities from the jury pool, resulting in underrepresentation in violation of the fair cross-section requirement.

### Denial of Funding For Pathologist and DNA Expert; *Brady*[26] Violation (Appellant's issue XI)

Appellant alleges in a single "issue" that "[t]he court denied Appellant the funds necessary to obtain a pathologist and present DNA expert evidence and the prosecutor failed to disclose critical documents directly relevant to Appellant's defense." Appellant's Brief at 88. Appellant cites specific places in the record to support his claim that the challenge to "the denial of funding for a DNA and forensic pathologist expert was preserved at trial." The alleged *Brady* violation related to this issue has nothing to do with expert reports or funding, but instead concerns the Commonwealth's alleged failure to disclose "reports generated by the Harrisburg police department's investigation up until the time the state police arrived," as well as "reports by and about emergency medical personnel[.]"[27] Appellant claims that appellate counsel was ineffective for failing to raise these issues or to seek a remand to obtain experts or develop the extra-record evidence along the lines of what Appellant later presented in the PCRA petition. *Id.* at 91–92, 83 S.Ct. 1194.

#### a. DNA Expert

The trial court granted Appellant's request for funding to conduct DNA testing and provided Appellant with the resources to secure an expert in forensics and crime scene investigation, who testified at trial. The report of the DNA testing showed that genetic material of someone other than Appellant and the murdered infant had been present on items taken from the stairwell where the killing occurred. The Commonwealth stipulated to the accuracy of the report, and the court permitted Appellant's forensics expert to read the

26. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

27. Apparently, the police reports disclosed to the defense were created between four to seven hours after the relevant events occurred. Appellant suggests that earlier reports must exist that were not disclosed. Appellant claims "it defies logic and common sense" that reports closer in time to the actual criminal events do not exist, and he asserts a *Brady* violation for not disclosing such posited reports. Appellant's Brief at 91.

contents of the report into the record at trial. The underlying issue here challenges the court's denial of Appellant's *pro se* request for funding to have the DNA technician, who actually performed the testing and prepared the report, testify at trial. Appellant alleges appellate counsel was ineffective for failing to pursue this alleged trial court error on direct appeal.

Appellant claims that "the court's denial of Appellant's request for funds to present a proper DNA expert violated the Sixth, Eighth, and Fourteenth Amendments." *Id.* at 91, 83 S.Ct. 1194. Appellant does not, however, explain how or why any questioning of the actual preparer of the DNA report was necessary or would have been beneficial to his defense. He states that he "was precluded from asking any question that only the expert could answer," but does not identify what question(s) he may have posed or the effect the answers might have had on the outcome of the proceedings. *Id.* Having failed to establish the merit of the underlying claim of trial court error, Appellant has necessarily failed to establish appellate counsel's ineffectiveness for failing to raise it on appeal. Accordingly, the PCRA court properly dismissed this issue without a hearing.

### b. Pathologist

Appellant filed a pre-trial motion seeking funding to hire a pathologist of his own choosing. At the hearing on the motion, Appellant answered in the negative when the court asked him whether he was seeking a pathologist in order to challenge the cause of the baby's death. It became apparent that Appellant wanted expert forensics review of, among other things, blood spatter at the crime scene. To that end, while the court held Appellant's motion in abeyance, the court did appoint an expert in forensics and crime-scene investigation who met with Appellant at the prison. On the first day of trial, Appellant renewed his motion for a forensic pathologist, stating that he wanted an expert to testify regarding the gunshot wounds Appellant had received. The Commonwealth responded that its pathologist would only be testifying regarding the fatal wounds inflicted upon the baby. The court

denied Appellant's motion. At trial, Appellant presented the testimony of the emergency physician who had treated his gunshot wounds.

In his amended PCRA petition, Appellant averred that the trial court erred in denying his motion and that Appellant had since procured an expert report from a pathologist, Dr. Charles Wetli, which would rebut the testimony of the pathologist who had testified at trial regarding the wounds inflicted on the baby.[28] For example, Dr. Wetli had allegedly concluded, among other things, that although the expert testimony at trial described the fatal wound as resulting from a "sawing" motion, his review showed that the fatal wound was also consistent with a "slicing" motion. Appellant's Brief at 88–89.[29] The PCRA court determined that such testimony would "not have had any significant impact at [Appellant's] trial," particularly given the "overwhelming consistent ... [and] credible eyewitness testimony presented at trial." PCRA Court Opinion at 16. Thus, the court denied relief on this claim.

Appellant now counters that the court's conclusion that the eyewitness testimony had been overwhelmingly consistent is "contradicted by the record." Appellant's Brief at 93. In particular, Appellant claims the eyewitness testimony of the police officers present at the scene was inconsistent and contradictory. Thus, Appellant claims he raised a material fact requiring an evidentiary hearing.

Appellant fails to demonstrate how Dr. Wetli's testimony that the baby was killed by a "slicing" motion instead of a "sawing" motion would have altered the outcome of the proceedings. Furthermore, the slicing-versus-sawing theory Appellant now poses is unrelated to the request he made pretrial, which did not seek expert funds to challenge issues relating to the cause of the baby's death. Any failure in

---

28. The Commonwealth's pathologist at trial was Dr. Wayne K. Ross.

29. Dr. Wetli's report would also allegedly have shown that Appellant's wounds were such that he could not have been standing and holding the baby either when the baby's throat was cut or when Appellant was shot.

securing funds to challenge the cause of death was a result of Appellant's own default. In addition, even if the failure to secure evidence along the lines of Dr. Wetli's later opinion was not chargeable to Appellant, he has not shown that such an opinion, if presented, in the context of the evidence at trial, would raise a reasonable probability of a different outcome. The claim of appellate counsel ineffectiveness fails and the PCRA court properly dismissed this claim without a hearing.

### c. *Brady* violation

*Brady* and its progeny dictate that, when the failure of the prosecution to produce material evidence favorable to the accused raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted. *Commonwealth v. Weiss*, 604 Pa. 573, 986 A.2d 808, 815 (2009). "To establish a *Brady* violation, an appellant must prove three elements: '(1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued.' " *Roney*, 79 A.3d at 607 (quoting *Hutchinson*, 25 A.3d at 310). The burden rests with the appellant to prove, by reference to the record, that evidence was withheld or suppressed by the prosecution. *Id.* (citations and quotation marks omitted).

The PCRA court dismissed the claim of appellate counsel's ineffectiveness for failing to raise a *Brady* claim on the basis that Appellant failed to show how any undisclosed police reports were favorable to his defense, much less material in the constitutional sense. Appellant now claims that the court improperly "fault[ed] Appellant for not stating with specificity the contents of the reports. Without access, Appellant is hardly in a position to do so[.]" Appellant's Brief at 93. We disagree. Appellant must prove a *Brady* violation. Appellant has not met the burden of proving the existence of the allegedly non-disclosed reports, much less their material content. He resorts instead to speculation that logic and common

sense dictate that undisclosed reports must exist, and baldly surmises that such hypothetical reports would show inconsistencies in the police eyewitness testimony regarding the murder. The argument that common sense and logic prove the existence of wholly hypothetical reports is unavailing, and the PCRA court properly rejected the derivative claim of counsel's ineffectiveness without a hearing.

### Conflict of Interest (Appellant's issue XIII)

Appellant alleged in his amended PCRA petition that his appellate counsel, attorney Michael Ferguson, labored under a conflict of interest because some five years previously, at the time of Appellant's trial, attorney Ferguson had been employed as an assistant district attorney in Dauphin County. Appellant made no claim that attorney Ferguson was involved in his prosecution, but argued that by virtue of his employment, attorney Ferguson would have known that Appellant's trial strategy included attempts to show that the Commonwealth presented perjured police testimony. He then argues that such alleged knowledge proves a conflict adversely affecting attorney Ferguson's performance on direct appeal. The PCRA court rejected the claim as based on "merely a bald assertion" of counsel's ineffectiveness, and as asserting no "facts that would demonstrate that [counsel's] prior employment somehow created a conflict of interest." PCRA Court Opinion at 41.

To establish a conflict of interest, a litigant must show both that counsel actively represented conflicting interests and that the actual conflict adversely affected counsel's performance. *Spotz*, 18 A.3d at 268. Here, as below, Appellant makes no claim that attorney Ferguson was actually involved in his prosecution, nor does he allege that counsel actively represented conflicting interests, or that any alleged conflict adversely affected counsel's performance. Instead, his claim assumes that the fact of Attorney Ferguson's prior employment with the District Attorney's Office alone proves the conflict. We are aware of no precedent holding that an actual conflict of interest arises where a former assistant

district attorney subsequently represents an individual on appeal whom he never had a role in prosecuting, and Appellant cites to none.[30] Accordingly, we affirm the PCRA court's dismissal of this claim without a hearing.

## Cumulative Error (Appellant's issue XIV)

Appellant argues that the cumulative effect of the alleged errors in his case entitles him to relief. While this Court has emphasized that "no number of failed claims may collectively warrant relief i[f] they fail to do so individually," *Sepulveda*, 55 A.3d at 1150 (quoting *Comonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 245 (2007)), we have also recognized that "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." *Id.* (quoting *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009)). To the extent we have adverted to prejudice principles in disposing of Appellant's cognizable claims of appellate counsel ineffectiveness, we are satisfied that, even if cumulated, Appellant is entitled to no relief.

## Conclusion

For the foregoing reasons, we hold that the PCRA court properly dismissed Appellant's petition for post-conviction relief without a hearing. Accordingly, we affirm the order denying relief. Jurisdiction is relinquished.

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD and STEVENS join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice STEVENS joins.

---

**30.** Although Appellant cites *Strickland* for the rule that "prejudice is presumed when counsel is burdened by an actual conflict of interest," a claim of an actual conflict of interest is analyzed under the United States Supreme Court's decision in *United States v. Cronic*, 466 U.S. 648, 662 n. 31, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

Justice EAKIN files a concurring opinion in which Justice STEVENS joins.

Justice SAYLOR files a dissenting opinion.

CASTILLE, C.J., concurring.

I join the Per Curiam Opinion in its entirety. I write separately to address my continuing concerns respecting attempts by the Federal Community Defender's Office ("FCDO") to extend this Court's unfortunate decision in *Commonwealth v. Brown*, 582 Pa. 461, 872 A.2d 1139 (2005) (plurality), and further negate the PCRA's [1] waiver provision, thereby allowing capital defendants to undo trial level defaults through the guise of dubious—or, in this case, beyond dubious—retrospective claims of incompetency.

The FCDO's abusive brief in this appeal simply assumes—without candid acknowledgment or discussion—that if it attaches a claim of incompetency to a defaulted trial level claim, the PCRA waiver provision disappears. The attempt expands the narrow exception in *Brown* beyond recognition. This abuse deriving from *Brown*, at least in the hands of the FCDO, leads me to reiterate and expand upon my fixed disagreement with extensions of the Court's decision in *Brown*, as well as with the *Brown* decision itself. *See Commonwealth v. Bomar*, 629 Pa. 136, 104 A.3d 1179, 1217–19 (2014) (Castille, C.J., concurring).

## I.

There is a presumption of free will and self-determination in the criminal justice system in America, which manifests itself in jurisprudence recognizing that a citizen charged with a criminal offense is free to waive his right to counsel and to represent himself. *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (right of self-representation guaranteed under structure of Sixth Amendment to U.S. Constitution); *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1334–35 (1995). A capital defendant likewise is free to

1. Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546.

waive more discrete rights, such as his case in mitigation, so long as the waiver is knowing, intelligent and voluntary, as it was here. *Commonwealth v. Puksar*, 597 Pa. 240, 951 A.2d 267, 288 (2008). In the case of a counseled defendant, the defendant's lawyer cannot later be held ineffective for following his client's instructions in this regard. *See, e.g., Schriro v. Landrigan*, 550 U.S. 465, 475–76, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). There are consequences of self-representation, of course, and properly so; most relevant here, a defendant who knowingly and voluntarily waives his right to counsel and represents himself at trial cannot later seek to revive defaulted claims by alleging his own ineffectiveness, or the ineffectiveness of his standby counsel. *Commonwealth v. Fletcher*, 586 Pa. 527, 896 A.2d 508, 522 (2006); *see also Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 736 (2004). There is nothing unfair in this circumstance: citizenship includes certain responsibilities, and trials are momentous events.

In this case, appellant chose to represent himself at trial; he deliberately elected to waive mitigation evidence; he was fairly tried under the circumstances he demanded; and he was convicted and sentenced to death by a unanimous jury of his peers. Given appellant's criminal conduct—brutally stabbing Duana Swanson and then murdering his fourteen-month-old stepson Basil by cruelly slitting his throat—the penalty verdict likely was a foregone conclusion. Represented by counsel on direct appeal, who dutifully litigated the most important issue—appellant's waiver of counsel—among other claims, appellant's conviction was unanimously affirmed. *Commonwealth v. Blakeney*, 596 Pa. 510, 946 A.2d 645, 654, 662 (2008), *cert. denied*, 555 U.S. 1177, 129 S.Ct. 1317, 173 L.Ed.2d 596 (2009).

Given a pre-trial finding of competence to stand trial, and appellant's valid waiver of counsel, this should have been a relatively simple PCRA matter. As recognized by the Per Curiam Opinion, appellant's own choices and defaults severely restricted his potential universe of properly cognizable, non-frivolous claims on collateral attack. But, enter the self-appointing FCDO, with its seemingly endless federal resources, *see Commonwealth v. Spotz*, 627 Pa. 257, 99 A.3d 866

(2014) (single-Justice Opinion by Castille, C.J.), which is as monomaniacal as Captain Ahab in *Moby–Dick* in seeking to confuse and thereby subvert Pennsylvania state procedural default doctrines in capital cases. Here, the FCDO employs a scheme this Court has seen before: the FCDO tries to find ways to avoid the natural and proper consequences of the pre-trial finding of competency; appellant's ensuing deliberate decision to represent himself at trial; and his equally deliberate decision not to pursue an affirmative case in mitigation.[2]

As I recently noted in my concurrence in *Bomar*, *Brown*, whether right or wrong, "established a judicially-manufactured narrow 'exception' to the waiver command of the [PCRA], 42 Pa.C.S. §§ 9541–9546, limited to claims of competency to stand trial which were defaulted on direct appeal. *Brown*, 872 A.2d at 1155–56 (claim respecting competence to stand trial not subject to PCRA waiver); *see also Commonwealth v. Fletcher*, 604 Pa. 493, 986 A.2d 759, 778, n. 24 (2009) (*Brown* spoke to single competency issue and did not speak to issue of competency to waive right to counsel for post-trial proceedings)." *Bomar*, 104 A.3d at 1217 (Castille, C.J., concurring). The exception to waiver created in *Brown* was well-intended, I know, but I respectfully remain of the view that the rule was wrong when announced, *see Brown*, 872 A.2d at 1161 (Castille, J., concurring, joined by Eakin, J.), and the FCDO's abuse of the rule in this case and in other recent cases reveals an unintended and harmful consequence of the rule set in *Brown*. The General Assembly cannot correct this Court's error in *Brown*. I would overrule both *Brown* and its accidental progeny.

As I noted in my *Bomar* concurrence:

2. Given that appellant's circumstances arise from his self-representation, the FCDO had more incentive than usual to create delay in this case. And so, the FCDO requested five extensions of time to brief the appeal, and also requested permission to exceed the then–70–page briefing limitation. Both requests were granted (at a time when the Court was less attuned to the FCDO's obstructionist agenda in capital cases). Despite the narrow universe of properly available claims, the FCDO then abused the Court with a brief of 98 pages, raising 14 claims, some of which include sub-claims. The Court should be mindful not to tolerate these sorts of abuses in the future.

It is difficult to conceive of a claim that more directly implicates *Strickland v. Washington,* [466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ]—and does not warrant usurping the PCRA's waiver provision—than a defaulted competency to stand trial issue. Who knows better than trial counsel whether the client was "incapable of meaningfully assisting in his defense" at the relevant time? Indeed, if a capital defendant truly was incompetent—was so impaired that he could not even communicate with and assist counsel—it is difficult to believe that his counsel would not notice, unless counsel himself was incompetent. And, we have Sixth Amendment principles to govern that eventuality: there is no reason to negate a salutary provision of the PCRA.

*Bomar,* 104 A.3d at 1218 (Castille, C.J., concurring).

Setting aside logic and separation of powers principles, *Brown* remains the law until a Court majority is convinced of its error, and the Per Curiam Opinion, which proceeds to the merits per the precedent in *Brown,* properly explains why appellant's retrospective claim of incompetence to stand trial is meritless. As in *Bomar,* the FCDO in this case was able to turn to its stable of compliant experts and produce Dr. Richard Dudley, M.D., a forensic psychiatrist [3]—to conduct a retrospective competency evaluation and opine that, yes indeed, appellant was not competent at the time of his trial. However, this opinion, which was produced by the FCDO solely in conjunction with its collateral attack upon appellant's trial level defaults, was squarely contradicted by multiple contemporaneous sources: the pre-trial findings by the Mayview State Hospital psychiatrist who evaluated appellant prior to trial, the trial record reflecting appellant's actual performance in representing himself, and the trial court's extensive first-

3. Dr. Dudley has predictably testified on behalf of FCDO-represented capital defendants in numerous other capital cases, including *Bomar,* 104 A.3d at 1219; *Commonwealth v. Baumhammers,* 625 Pa. 354, 92 A.3d 708, 718 (2014); *Commonwealth v. Fears,* 624 Pa. 446, 86 A.3d 795, 813 (2014); *Commonwealth v. Sepulveda,* 618 Pa. 262, 55 A.3d 1108, 1120 (2012); and *Commonwealth v. Banks,* 612 Pa. 56, 29 A.3d 1129, 1135–37 (2011), *cert. denied,* —— U.S. ——, 133 S.Ct. 100, 184 L.Ed.2d 233 (2012).

hand observations of a defendant who actually tried his own case. As I explained in *Bomar*, retrospective competency claims are particularly ripe for abuse by anti-death penalty advocacy groups like the FCDO, like-minded experts in their effective employ, and capital defendants themselves, who obviously have nothing to lose by abetting a fraudulent claim. The courts should properly be skeptical of such retrospective claims, particularly in circumstances like this case, where the defendant was evaluated prior to trial, and then conducted his own defense. *Bomar*, 104 A.3d at 1219; *see also Commonwealth v. Hackett*, 626 Pa. 567, 99 A.3d 11, 39 (2014) (Castille, C.J., concurring) (explaining similar incentives with retrospective claims of mental retardation/intellectual disability brought under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). To its credit, the PCRA court in this case did not allow itself to be misled by the FCDO's agenda and the frivolous claims of incompetency it pursued here. Given the record circumstances reflecting appellant's ability to understand the trial proceedings and to assist in his defense contemporaneous to the trial, this case is revealing because it shows just how far the FCDO will go to promote its cause.

The FCDO tactic here is not new: the FCDO has employed it in prior cases, seeking to undo valid waivers and attack a defendant's reasoned decision to waive counsel or the presentation of mitigation evidence by raising retrospective claims of incompetency. *See Michael v. Wetzel*, 570 Fed.Appx. 176, 181–84 (3d Cir.2014) (alleging capital defendant's incompetency to waive right to federal *habeas corpus* review); *Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 266–67 (2011) (alleging capital defendant's incompetency to waive counsel); *Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282, 288–91 (2010) (alleging capital defendant's incompetency to waive right to counsel for collateral review); *Puksar*, 951 A.2d at 268–69 (alleging capital defendant's incompetency to waive presentation of mitigating circumstances); *accord Commonwealth v. Sam*, 597 Pa. 523, 952 A.2d 565, 568 (2008) (noting that FCDO counsel initiated PCRA proceeding for non-FCDO client by filing PCRA petition without authorization, claiming he was

doing so on petitioner's "behalf"). The effect of *Brown* having manifested itself, we should overrule that case and discourage this particular strain of fraudulent claims.

The FCDO proceeds under an assumption that the *Brown* decision opened the door to relaxed waiver of other kinds. This is not the first time the FCDO has sought to expand *Brown* and, as noted by the Per Curiam Opinion, the Court unfortunately has reviewed unpreserved challenges to the very different claim of competency to waive the right to counsel on at least two other occasions, broadly stating that a majority of the Court has agreed that competency claims are not subject to the waiver provision of the PCRA. *Spotz*, 47 A.3d at 79, n. 6; *Spotz*, 18 A.3d at 262, n. 10. These broad statements were mistaken when they were made, and represented an unexplained extension of *Brown*. I regret my failure, and the Court's failure, to then perceive what was at work (buried as we were by the deliberately abusive avalanche of claims in the FCDO briefs in the *Spotz* cases). But, it is now crystal clear what the FCDO is up to: it dresses up other defaulted claims in the garb of "incompetence" in an attempt to get the defendant out from under his knowing and voluntary decision to represent himself. I remain of the belief that the decisions in *Brown* and *Spotz* should be prospectively overruled.

## II.

As the Court notes, appellant's first four claims all posit that his alleged incompetency affected the trial. The only two competency challenges currently cognizable per *Brown* and *Spotz* are: the attack on appellant's competency to stand trial and the attack on his decision to waive the right to counsel. The Court correctly rejects appellant's arguments and disposes of these twin frivolous issues, based upon the pre-trial findings by the Mayview State Hospital psychiatrist, the trial record, the contemporaneous evidence, and the trial court's first-hand observations.

Appellant's claims relating to his competency to waive the right to present mitigation evidence (Claim II) and the related challenge to the adequacy of the waiver colloquy (Claim III), however, are defaulted per statutory command of the PCRA, and I would explicitly say so. Appellant made the decision to represent himself at trial and he raised no objections in this regard. Appellant was both presumed to be competent to stand trial, and was actually found to be competent. That contemporaneous competency determination subsumed appellant's lesser-included claims of incompetency for specific purposes now forwarded retrospectively by the FCDO. These claims are plainly waived under the PCRA; nothing in *Brown* supports a judicial negation of the legislative judgment embodied in the PCRA; and appellant forwards no developed argument as to why the legislation should be ignored. These claims should be identified and dismissed as frivolous.

Separately, appellant challenges the adequacy of the waiver of counsel colloquy, a claim he has already pursued and lost on direct appeal. Appellant now alleges direct appeal counsel ineffectiveness in litigating the claim (Claim III). Appellant avers that "there are readily identifiable reasons why the trial court's colloquy was inadequate to sustain a waiver of counsel.... Appellate counsel, however, failed to bring those specific deficits to this Court's attention." Appellant's Brief at 54. Appellant cites this Court's observation on direct appeal that he did "not identify, let alone elaborate upon, any information or right that the court failed to explain to him" in support of his challenge to the colloquy. *Blakeney*, 946 A.2d at 656. Indulging a typical FCDO tautology, appellant also argues that appellate counsel should have known that appellant's waiver was not knowing, intelligent and voluntary because, of course, appellant was incompetent at the time he waived his right to the assistance of counsel. This claim likewise is frivolous. Although dressed up as an attack on appellate counsel's failures on direct appeal, appellant is actually challenging the failure to object at trial to an allegedly deficient colloquy. By choosing to represent himself, appellant alone is responsible for that trial level default, and there

is no cognizable claim of appellate counsel ineffectiveness: this is just more FCDO obstruction and smoke screen.

Many of appellant's remaining claims are waived: Claims VI, VII, X, and XII each could have been raised at trial, but were not preserved and were not raised on direct appeal. Accordingly, they are unavailable under the PCRA, and the FCDO's frivolous pursuit of them contemptuously burdens the Court gratuitously.

I write to supplement the analysis of the Court only with respect to Claim VIII, which alleges that two jurors failed to disclose biases affecting their ability to be fair and impartial. Although inartfully phrased, appellant's apparent intention in this claim is to argue that the jurors' alleged bias was not discovered until after the trial, and could not have been previously raised, and, for that reason the claim is not waived. I would hold that this sort of claim—premised upon a collateral attack upon the honesty and integrity of members of the jury—is not cognizable under the PCRA. The cases appellant cites speak to the jury selection process, and involve preserved challenges. *See* Appellant's Brief at 81. None of those cases remotely suggested that a cognizable constitutional claim arises from a party's later collateral attacks upon jurors. Moreover, even if such a practice were someday deemed proper, the "new" information the FCDO alleges about the two jurors does not remotely demonstrate juror "bias" in a constitutional sense. This issue plainly is frivolous.

Justice STEVENS joins this opinion.

EAKIN, J., concurring.

I fully join the *per curiam* opinion. I write separately to note my continuing disagreement with the notion that competency challenges are immune from the PCRA's waiver provision. *See Per Curiam* Op., at 24–26, 108 A.3d at 752–54 (citations omitted). The plain language of the PCRA's waiver provision states: "[A]n issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction

proceeding." 42 Pa.C.S. § 9544(b). Nowhere does the statute contain a waiver exception for challenges based on claims of incompetency. *See Commonwealth v. Brown*, 582 Pa. 461, 872 A.2d 1139, 1158–68 (2005) (plurality) (Castille, J., concurring, joined by Eakin, J.); *Commonwealth v. Santiago*, 579 Pa. 46, 855 A.2d 682, 704–11 (2004) (plurality) (Castille, J., concurring, joined by Eakin, J.). As the *per curiam* opinion points out, appellant failed to raise this issue at trial or on direct appeal.

*Brown* was a plurality decision that garnered a majority view that a defendant's failure to raise a competency issue— either before trial, at trial, or on direct appeal—does not render it waived under the PCRA. *See Brown*, at 1170 (Nigro, J., concurring and dissenting) (agreeing competency challenges not subject to PCRA waiver). I did not join that thinking then, nor do I now. *See id.*, at 1158–68 (Castille, J., concurring, joined by Eakin, J.) (finding judicial relaxed waiver rule for competency claims directly conflicts with plain language of PCRA's waiver provision); *see also Santiago*, at 704–11 (Castille, J., concurring, joined by Eakin, J.) (same).

As such, I would review only appellant's properly preserved ineffectiveness claims—counsels' failure to allege appellant's incompetence. As to those ineffectiveness claims, I agree with the *per curiam* opinion's holding appellant's claims lack merit and do not warrant relief.

Justice STEVENS joins this opinion.

SAYLOR, J., dissenting.

As noted by Mr. Chief Justice Castille, Appellant submitted a report of a forensic psychiatrist to the PCRA court, containing the opinion that Appellant lacked competency at the time of his trial, including the ability to knowingly and intelligently waive his rights and represent himself. Were this opinion to be believed, Appellant would be entitled to relief in the form of a new trial.

Given, then, the material factual dispute concerning Appellant's competency, the applicable rules of criminal procedure required an evidentiary hearing for such controversy to be

 

resolved on a developed record. *See* Pa.Crim.P. 909(B). Since no hearing was afforded, I would remand for the appropriate procedure to be implemented.