J-S16030-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LUCAS ALLEN NEWNAM | : | |
| | : | |
| Appellant | : | No. 791 MDA 2021 |

Appeal from the PCRA Order Entered June 8, 2021,
in the Court of Common Pleas of Lancaster County,
Criminal Division at No(s): CP-36-CR-0003420-2016.

BEFORE:   PANELLA, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                **FILED:  JULY 11, 2022**

Lucas Allen Newnam appeals from the order denying his first timely petition filed pursuant to the Post Conviction Relief Act ("PCRA")[1] following his conviction for first-degree murder.  We affirm.

Newnam's conviction arose after he shot Julius Dale, III ("the victim") on May 27, 2016.  His jury trial began on July 31, 2017.  The PCRA court summarized the testimony from the six Commonwealth witnesses who were at the residence that day as follows:

> Dan Umble testified that he and [Newnam] lived together at 304 Creek Road in Sadsbury Township.  A couple months prior to the shooting, [Newnam] gave the victim permission to move into the house.  According to Umble, [Newnam] and the victim both

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S.A. §§ 9541-46.

sold drugs out of the house and it was "the only thing anybody did in the house to make money other than me." On May 27, 2016, Umble was working in the garage when he heard [Newnam] and the victim arguing. Umble saw [Newnam] come out of the house holding a sawed-off shotgun and heard him yell for Umble to "get him out of the house or I'm gonna kill him." Umble could not see the victim. Umble then heard a gunshot. When he walked up to the house, Umble saw the victim [lying] dead in the threshold of the basement door and [Newnam] had a shotgun in his hands. At no time did Umble hear [Newnam] say anything to indicate he was in fear of the victim.

Mark Porter testified that he also lived at 304 Creek Road with [Newnam] and the victim, and he believed they were in business together selling drugs out of the house. On May 27, 2016, Porter saw [Newnam] and the victim playing outside with fireworks and hanging out together in the basement area without any sign of conflict. The victim had a handgun in a holster on his side. Porter then walked down to the garage and shortly thereafter he heard [Newnam] yelling at the victim for betraying him. [Newnam] sounded angry, and never said anything to suggest he was in fear. Porter heard [Newnam] yell for Umble to come and get the victim out of his face, followed by a gunshot. Porter did not see either individual and he did not see what occurred.

Anthony Williams testified that he frequently visited 304 Creek Road, where both the victim and [Newnam] lived and sold drugs. Williams stated that a conflict arose between [Newnam] and the victim days before the shooting because [Newnam] became aware the victim was going behind [Newnam's] back to buy drugs. On May 27, 2016, Williams arrived at the residence and heard arguing. Williams saw [Newnam] and the victim emerge from the basement door with [Newnam's] back to the victim. [Newnam] was very agitated and was holding a firearm. [Newnam] kept stating that the victim had betrayed him and he told the victim to leave. The victim, who seemed remorseful, refused to leave because it appeared he wanted to work things out. [Newnam] told the victim two or three times to leave or [Newnam] would shoot him. [Newnam] also called for Umble to remove the victim from the property. [Newnam] then turned around to face the victim, pulled the trigger without hesitation, and shot the victim.

Williams stated he had a clear view of [Newnam] and the victim during the entire incident. When he was shot, the victim did not have anything in his hands, he did not reach for anything at any point in time, and he did not say anything threatening to [Newnam]. The victim was gesturing with his hands, but the gestures did not seem threatening or aggressive. At no time did Williams hear [Newnam] say anything to suggest he was in fear of the victim. [Newnam] then yelled for everyone to help him drag the body into the woods and told them to give up their keys and cellphones. Williams put his keys and cellphone on the ground, then backed up slowly down the walkway.

Rachel Long testified that she knew [Newnam] for several years, and knew he was selling drugs out of 304 Creek Road. When Long was at the residence with her son on May 27, 2016, she saw the victim with a handgun in a holster on the outside of his clothing. The victim had just recently started wearing the gun and Long did not believe there was anything unusual about his demeanor. Long also saw [Newnam], who told her she should not have her son "at a drug house." Later that day, Long heard [Newnam] and the victim arguing, at which time she heard [Newnam] yelling that the victim had betrayed him. At no time did Long hear [Newnam] say anything that would suggest he was in fear. Long then heard a gunshot.

Alexis Hernandez-Gable testified that she was at 304 Creek Road on May 27, 2016, when she heard Newnam and the victim arguing downstairs. She could hear both voices, but [Newnam's] voice was louder while the victim's tone was not unusual. They were arguing about money and [Newnam] kept saying "you betrayed me." Although Hernandez-Gable heard [Newnam] tell the victim to put his gun in the safe, she did not hear [Newnam] tell the victim to show his hands or say anything to indicate he was in fear. Hernandez-Gable then heard a loud gunshot and [Newman] stated that he shot the victim. When she left the residence, Hernandez-Gable saw the victim laying in the doorway and his hands were empty.

Erin Houck testified that she lived at 304 Creek Road with [Newnam] and the victim, who were both in the business of selling drugs out of the house. On May 25, 2016, the victim informed Houck that he bought drugs from [Newnam's] mother. The victim also pulled out a gun and stated he would kill [Newnam]. Houck warned [Newnam] about the threat that same day. On May 26, 2016, [Newnam] and the victim got into an argument because the

victim was buying drugs from [Newnam's] mother and [Newnam] did not approve. [Newnam] repeatedly told the victim to leave the house.

On May 27, 2016, Houck awoke around 12 noon and saw that the victim had returned to the residence. [Newnam] was still sleeping. The victim decided to wake [Newnam] because it was Friday and it was time to make money by selling drugs out of the house. The victim was loud and animated, but he was not violent or aggressive in any way. When he was awakened, [Newnam] told the victim he had to leave or give [Newnam] his gun. The victim declined. The victim was known to wear a gun on his hip, but Houck did not see the victim with a gun that day and did not hear him threaten [Newnam] with a gun. Houck also did not see the victim do anything that was threatening. [Newnam] had a gun strapped around his neck.

Houck went from the basement where [Newnam] and the victim were located to the [third floor] of the house, at which time she heard [Newnam] yell for Dan Umble to "get [the victim] the hell out of here." Houck then heard a gunshot, followed by [Newnam] demanding that everyone give him their cellphones. Houck did not see the shooting. At no time during the argument did Houck hear [Newnam] ask the victim to put down a gun, show his hands, or say anything that would indicate [Newnam] was in fear of the victim. Thereafter, Houck saw that [Newnam] was still armed with a gun and the victim was [lying] in a doorway.

PCRA Court Opinion, 8/11/21, at 3-7 (citations omitted).

In addition to these witnesses, the Commonwealth presented testimony from various law enforcement authorities who responded to the scene and searched for Newnam, who had fled into the woods and was not captured until the next morning. A Pennsylvania trooper also testified to finding the victim's body covered by a blue tarp outside the front of the house. Following his arrest, Newnam was interviewed by the police. The PCRA court summarized this interview as follows:

- 4 -

Trooper Michael Snyder interviewed [Newnam] at [the Pennsylvania State Police] barracks shortly after [Newnam] was taken into custody. According to [Trooper] Snyder, [Newnam] was alert, coherent, and did not appear intoxicated. The ninety-minute interview, which was audio and visually recorded, was played for the jury. During the interview, [Newnam] initially claimed he did not live at 304 Creek Road, non-white people came to the house to hassle the victim over drug money, [Newnam] fled the house before anything happened to the victim, and he repeatedly swore he did not shoot the victim. At trial, [Newnam] told the jury "most of that was totally bullshit on my behalf."

PCRA Court Opinion, 8/11/21, at 8-9 (citations omitted).[2]

The PCRA court then summarized the evidence presented by the defense, first continuing with Newnam's own testimony:

[Newnam] began by telling the jury that he had been selling marijuana and methamphetamine for one year because he had no other source of income, selling drugs was a long-term productive way to make a living, and it was "easier than actually working." [Newnam] allowed the victim to stay at 304 Creek Road rent free, and he gave the victim drugs [that] the victim could resell for profit. [Newnam testified that the victim used some of these drugs, which prevented him from effectively dealing them. Newnam previously took the victim's gun as collateral until the victim could pay off his $1,200 debt.]

[Newnam] stated that he and the victim got into an argument one day prior to the shooting because the victim was stealing drugs. [Newnam] asked the victim to leave and the victim complied. When the victim returned [later that day], [Newnam] again made it clear that [the victim] had to leave permanently and the victim left a second time.

On May 27, 2016, the victim returned to the residence and they began arguing about the theft. [Newnam] told the jury the victim was high and jumpy, and he had a gun on his hip.

---

[2] On cross-examination at trial, although Newnam denied that he hid in the woods and hid his cell phone to prevent the police from finding him, he acknowledged that he made these statements to his mother in calls that were recorded at the county prison.

Immediately prior to the shooting, [Newnam] was yelling at the victim for betraying him by stealing marijuana from the house. [Newnam] also heard the victim was threatening his life. [Newnam] denied killing the victim over a rumor that the victim was buying drugs from [Newnam's] mother even though he told the police during his interview that the argument was over the victim buying drugs from his mother. [Newnam] explained the contradiction by stating, "I lied a lot to the troopers."

[Newnam] testified that the victim poked him in the chest while they were inside the basement, [Newnam] picked up his shotgun as he backed out of the door because he was scared of the victim. [He] also yelled for Dan Umble to remove the victim from the residence, or "somebody's gonna get shot." [Newnam] claimed the victim then reached for his gun so [Newnam] shot him out of fear for his life. [He] agreed that he asked everyone for their phones and keys so they could not call the police, he dragged the victim's body, covered it with a tarp, and ran into the woods. [Newnam] asserted he returned to the scene the next morning to turn himself in to police. However, [he] admitted he gave the police a false name, false date of birth, false social security number, and a false story about why he was there.

PCRA Court Opinion, 8/11/21, at 9-10 (citations and footnotes omitted).

Finally, the PCRA court summarized the testimony of five witnesses called by the defense to corroborate Newnam's claim of self-defense:

Lauren Serbin testified that she was acquainted with the victim and saw him under the influence of methamphetamine seven or eight times. In February 2016, Serbin noted the victim appeared agitated, grabbed her arms very tightly, and said people were after him. On another occasion the victim assaulted her friend. Another time, Serbin heard the victim state in conversation that he would kill anyone who tried to take what he had. Serbin believed the victim was under the influence of methamphetamine on each occasion. On cross-examination, Serbin acknowledged she wrote a letter to [Newnam] in September of 2016 stating, "I will do what I can to make sure you don't spend your life in prison," and admitted she did not inform police about the victim's behavior when a state trooper came to speak with her prior to trial.

- 6 -

Kristalee Ryan testified that she was a friend of both [Newnam] and the victim. At the time of the murder, Ryan was living in her car in the driveway at 304 Creek Road. On May 26, 2016, when she and the victim drove around most of the day trying to cash a check, the victim used marijuana and methamphetamine. According to Ryan, the victim got extremely frustrated and screamed with road rage. When they returned to 304 Creek Road around 6:00 p.m., [Newnam] and the victim had an argument over drugs and [Newnam] told the victim to leave. Ryan then drove the victim to his father's house. During the drive, the victim seemed upset and told Ryan "one of these days somebody's gonna get hurt."

Cheyenne Seats testified that the victim and Anthony Williams came to her house late in the evening on May 26, 2016, and the victim talked to everyone about selling methamphetamine. Seats then heard the victim ask Williams to go get bullets because his gun was empty. Williams left the house and when he returned, he pulled bullets from his bag. The victim then loaded his pistol. Seats also saw Williams and the victim use methamphetamine before they left the house around 9:00 a.m. [the next morning]. On cross-examination, Seats stated she believed the victim was arming himself and recruiting others to sell methamphetamine for him. Seats also admitted she did not report this information to [the state police] even though she was aware the victim was killed the next day, [Newnam] was charged with killing him, and [Newnam] was a meth dealer. Seats stated that prior to her testimony at trial she talked to "[t]he person I was supposed to talk to," but she had no opportunity to share her information with law enforcement authorities in the fourteen months since the murder because she moved.

Zachary Wible testified that he was present when the victim and Williams showed up where Seats was living and the victim asked everyone in the house to sell methamphetamine for him. Shortly thereafter, Williams left on his own accord. Williams returned in the early morning hours with a silver and black handgun, gave the gun to the victim, and the victim loaded the gun with bullets. The victim then left the house between 7:00 a.m. and 8:00 a.m. Wible described the victim's demeanor as "shady . . . like there was something going on that he wasn't talking about." Wible admitted on cross-examination that he did not report this information to [the state police], explaining that he "didn't think anything of it . . . I figured if someone needed to know something like that, they would get in touch with me."

Allen Crosby testified that he was the boyfriend of [Newnam's] mother, Lisa Fisher. On May 21, 2016, almost one week before the shooting, the victim came to their residence and told Crosby and Fisher that they had to "do something about [Newnam]. He's getting out of hand." As Fisher left the room, the victim stood next to Crosby and stated "he's just getting out of hand, I'm gonna have to take him down." The victim then reached around and pulled out a holster with a gun. On cross examination, Crosby acknowledged he was present when police came to speak with Fisher after the shooting, and he did not bring this alleged threat to their attention even though he knew that [Newnam] had been charged with murdering the person who had shown him a gun and threatened to shoot [Newnam] approximately one week before [Newnam] killed the victim.

PCRA Court Opinion, 8/11/21, at 11-13 (citation omitted).

On August 4, 2017, the jury found Newnam guilty of first-degree murder. On August 9, 2017, the trial court sentence him to a mandatory term of life imprisonment without the possibility of parole. Newnam filed a post-sentence motion, which the trial court denied. Newnam appealed to this Court. In a non-precedential decision filed on January 25, 2019, we affirmed his judgment of sentence. *Commonwealth v. Newnam*, 209 A.3d 530 (Pa. Super. 2019). Our Supreme Court denied Newnam's petition for allowance of appeal on June 26, 2019. *Commonwealth v. Newnam*, 215 A.3d 970 (Pa. 2019). On January 13, 2020, the United States Supreme Court denied Newnam's petition for *certiorari*. *Newnam v. Pennsylvania*, 140 S.Ct. 904 (2020).

On January 12, 2021, Newman filed a timely PCRA in which he raised two clams of ineffectiveness of trial counsel. The Commonwealth filed a response. On May 7, 2021, the PCRA court issued a Pa.R.Crim.P. 907 notice

- 8 -

of its intent to dismiss Newnam's PCRA petition without a hearing. Newnam did not file a response. By order entered June 8, 2021, the PCRA court dismissed Newnam's petition. This appeal followed. Both Newnam and the PCRA court have complied with Pa.R.A.P. 1925.

Newnam raises the following two issues on appeal:

1. Did the PCRA Court abuse its discretion in dismissing [Newnam's] claim without [an] evidentiary hearing where [he] adequately pled that he was entitled to relief based on ineffective assistance of counsel for counsel's failure to furnish the Commonwealth with the prior written statements of two defense witnesses?

2. Did the PCRA Court abuse its discretion in dismissing [Newnam's] claim without [an] evidentiary hearing where [he] adequately pled that he was entitled to relief based on ineffective assistance of counsel for counsel's failure to elicit [at] trial from these two defense witnesses that they had in fact provided a private investigator with written statements?

Newnam's Brief at 5.[3]

This Court's standard of review for an order dismissing a PCRA petition is to ascertain whether the order "is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless

_____

[3] In its brief, the Commonwealth asks this Court to dismiss Newnam's appeal for failing to file timely his appellate brief and reproduced record pursuant to Pa.R.A.P. 2188. As Newnam's tardiness in filing his brief and complete failure to designate a reproduced record is ineffectiveness *per se*, we decline to dismiss his appeal on this basis and will address the merits of his claims.

there is no support for the findings in the certified record." ***Commonwealth v. Barndt***, 74 A.3d 185, 191-92 (Pa. Super. 2013) (citations omitted).

> The PCRA court has discretion to dismiss a petition without a hearing when the court is satisfied that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings. To obtain a reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of material fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing.

***Commonwealth v. Blakeney***, 108 A.3d 739, 750 (Pa. 2014) (citations omitted).

Newnam's issues challenges the effectiveness of trial counsel. To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place. ***Commonwealth v. Johnson***, 966 A.2d 523, 532 (Pa. 2009). "Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." ***Id.*** This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) the petitioner was prejudiced by counsel's act or omission. ***Id.*** at 533. A failure to satisfy any prong of the test for

ineffectiveness will require rejection of the claim. ***Commonwealth v. Martin***,

5 A.3d 177, 183 (Pa. 2010).

Because both of Newnam's ineffectiveness claims involve the testimony

of Seats and Crosby, we address them together. According to Newnam:

> Eight months before trial, defense counsel was armed with written statements from [Seats and Crosby] that substantially corroborated Newnam's forthcoming trial testimony. Trial counsel was not aware these statements existed and therefore did not furnish them to the Commonwealth. Consequently, the Commonwealth was able to effectively attack these witnesses' credibility by repeatedly noting that these witnesses were providing their accounts for the first time at trial, sixteen months after the shooting. Compounding this error in refusing to furnish these prior statements, counsel failed to elicit any testimony from [them] that they had in fact given their statements long before trial. The result was the presentation of testimony from [Seats and Crosby] was incomplete, and the jury did not deliberate with the full truth. A new trial, or at least an evidentiary hearing, is warranted.

Newnam's Brief at 10.

The PCRA court found these claims lacked merit, because Newnam

essentially mischaracterized the Commonwealth's cross-examination of Seats

and Crosby:

> While [Newnam] asserted in his PCRA petition that he was prejudiced when the Commonwealth was able to argue that Seats and Crosby were not credible because their accounts were recently fabricated, a review of the record shows the Commonwealth did not challenge the credibility of Seats or Crosby based on recent fabrication. Rather the Commonwealth questioned [Seats and Crosby] on their failure to provide this important information to law enforcement authorities prior to trial.

PCRA Court's Opinion, 8/11/21, at 15 (footnote omitted).

The court then cited from the relatively brief cross-examination of Seats and concluded that "the prosecutor clearly focused on Seats' failure to provide this critical information to law enforcement." *Id.* at 16. The court also cited the brief cross-examination of Crosby and concluded that "the prosecutor's questioning focused solely on whether Crosby shared this information with the police." *Id.* at 17. The Court further cited the prosecutor's closing argument in which he argued that none of the defense witnesses previously informed the police of the information they provided in the trial testimony.

Finally, the PCRA court noted that:

> [T]he statements of Seats and Crosby were given to a defense investigator on November 15, 2016, approximately six months after the shooting. Thus, the witnesses would have been subject to the same line of cross examination and the Commonwealth could have made the same argument to the jury even if trial counsel had provided the statements to the Commonwealth. Seats and Crosby failed to provide this important information to police, they waited six months to provide this information to an investigator hired by [Newnam], and they did so only after they had the opportunity to align their accounts with Newnam's self defense claim. As such, this claim lacks merit.

PCRA Court Opinion, 8/11/21, at 18 (citation omitted).

As to trial counsel's failure to elicit testimony from Seats and Crosby that they had given prior consistent statements, the PCRA correctly concluded that these statements would not have been admissible as a prior inconsistent statement because they were given to the private investigator six months after the Commonwealth charged Newnam with homicide. *See id.* at 27

- 12 -

(citing Pa.R.E. 613(c), and **Commonwealth v. Hutchinson**, 556 A.2d 370, 372 (Pa. 1989). The court further found that even if trial counsel had elicited testimony that they did talk to a defense investigator six months after the murder, it was "unlikely such a disclosure would have enhanced the credibility of those witnesses." PCRA Court Opinion, 8/11/21, at 28.

Our review of the record provides ample support for the PCRA court's conclusion that Newnam's ineffectiveness claims lacked arguable merit.[4] The record supports the PCRA court's further observation that the Commonwealth briefly cross-examined four of the five defense witnesses in the same manner. **See id.** at 15, n.10. In addition, the victim's threat to kill Newnam came out as part of Houck's testimony for the Commonwealth.

Newnam's claims to the contrary are without merit. As correctly noted by the PCRA court, Newnam's trial counsel was under no obligation to furnish the prior statements of Seats and Crosby to the Commonwealth during

_____

[4] Although not necessary, the PCRA court also addressed the other two prongs of the ineffectiveness test. Our review of the record supports the PCRA court's conclusion that the reasonableness of trial counsel's strategy was apparent from the record: "[By withholding any prior statement by defense witnesses,] counsel presented the jury with an alternative theory of the incident, he attempted to discredit the quality of the police investigation through the testimony of witnesses not called by the Commonwealth, and he gave the Commonwealth little advance time to prepare.

The record further supports the PCRA court's conclusion that Newnam could not establish prejudice. As detailed above, the PCRA court found that the evidence from eyewitnesses to the shooting was overwhelming, and given their testimony, Newnam's claim of self-defense lacked credibility. **Id.** at 28.

discovery because they were not eyewitnesses to the shooting nor did they support an alibi or mental infirmity defense. *See* PCRA Court Opinion, 8/11/21, at 19, n.11. In addition, as noted by the PCRA court, providing these statements to the Commonwealth would have allowed the Commonwealth to interview them prior to trial and perhaps weaken or contradict their eventual trial testimony. *See id.* at 18. Although Newnam claims trial counsel could have just asked Seats and Crosby if they had made a previous statement rather than seek their admission, Newnam's Brief at 17, the inquiry also would have been subject to cross-examination by the Commonwealth.

Moreover, Newman's assertion that trial counsel could not remember whether the statements were in the defense file, Newnam's Brief at 13, cannot substitute for a certification from trial counsel as required to warrant an evidentiary hearing. *See* Pa.R.Crim.P. 905(a)(2). The PCRA court noted this shortcoming in Newnam's petition, and thus rejected his claim that the PCRA court decided "to conjure up a phantom 'reasonable basis'" for trial counsel's decision to forgo furnishing the statements to the Commonwealth. Newnam's Brief at 13.

Finally, Newnam summarizes his claims as follows:

> In essence, trial counsel's failure to disclose or otherwise use these witnesses' pre-trial written statements caused the very presentation of these witnesses to backfire. Instead of the defense putting forth credible testimony from witnesses who were recounting what they had said all along, the defense ended up presenting witnesses who undercut the defense theory because they seemed wholly incredible in light of the Commonwealth's fabrication argument.

Newnam's Brief at 15.

This claim ignores trial counsel's closing in which he turned these witnesses' failure to report to police into a defense argument that the police failed to do a complete investigation and that some of the defense witnesses did not go to the police because of their drug addictions and other criminal issues. *See* N.T., 8/3/17, at 786-794.

In sum, because the PCRA court correctly concluded that both of Newnam's ineffectiveness claims were meritless, there was no need for an evidentiary hearing. We therefore affirm, the court's order denying Newnam post-conviction relief.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 07/11/2022

- 15 -